AGRISTOR LEASING, a Wisconsin Partnership; Agristor Credit Corporation, a Delaware corporation; Steiner Financial Corporation, a Utah corporation, Plaintiffs,

William Dayon Taylor; Paulette Taylor, Defendants, Counter–Plaintiffs and Third–Party Plaintiffs–Appellees,

v.

A.O. SMITH HARVESTORE PRODUCTS, INC., Third–Party Defendant–Appellant.

No. 88–5226.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 15, 1988.

Jan. 9, 1989.

Rehearing and Rehearing En Banc Denied March 24, 1989.

therefore shed little light on claimant's condition prior to April 26, 1985.

John K. Maddin, Jr., Gracey, Maddin, Cowan & Bird, Nashville, Tenn., Arnold A., Jr., Hatfield, Van Cleave & Stulce, Chattanooga, Tenn., D. Michael Tranum, Knoxville, Tenn., Robert L. Crossley, Richard E. Herod, and James A. DeLanis, Nashville, Tenn., for Agristor Leasing, a Wisconsin Partnership, Agristor Credit Corp., a Delaware corp. and Steiner Financial Corp., a Utah corp., plaintiffs.

Malcolm L. McCune, James A. Vick, Gracey, Maddin, Cowan & Bird, Nashville, Tenn., Robert R. Ramsey, Burnett & Ramsey, Jamestown, Tenn., for William Dayon Taylor, defendant-appellee.

Robert R. Ramsey, Jamestown, Tenn., for Paulette Taylor, defendant-appellee.

Donald E. Egan, Lee Ann Watson, Bonita L. Stone, Katten, Muchin & Zavis, Chicago, Ill., John E. Brandon, David J. Pflaum, Watkins, McGugin, McNeilly & Rowan, Nashville, Tenn., for A.O. Smith Corp., defendant.

Before MILBURN and NORRIS, Circuit Judges, and SUHRHEINRICH, District Judge [*].

MILBURN, Circuit Judge.

A.O. Smith Harvestore Products, Inc. ("AOSHPI"), the third-party defendant, appeals from the judgment entered on the jury verdict for Dayon Taylor, the third-party plaintiff, in this diversity action originally brought to recover silos and damages for breach of a lease. The jury awarded Taylor approximately $1.1 million dollars in compensatory and punitive damages against AOSHPI on theories of strict tort liability, fraud, negligent and commercial misrepresentation. For the reasons that follow, we affirm.

[*] Honorable Richard F. Suhrheinrich, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I.

### A.

Plaintiffs Agristor Leasing, Agristor Credit Corp., and Steiner Financial Corp. ("creditors") filed this action against defendants William Dayon Taylor and Paulette Taylor on May 13, 1983. The creditors alleged the Taylors leased several silos and related equipment (hereinafter collectively referred to as "Harvestore silos") and had defaulted on their monthly payments.

On August 5, 1983, the Taylors answered and filed counterclaims against the plaintiffs and a third-party complaint against AOSHPI, A.O. Smith Corp., and Robert Brown, d/b/a East Tennessee Silo Builders. AOSHPI manufactures the Harvestore silos; the A.O. Smith Corp. is AOSHPI's parent corporation; and Brown erected the silos on the Taylor farm. The Taylors alleged the silos were defective and filed claims based upon allegations of fraud, negligent misrepresentation, sections 402A and B and 552(d) of the *Restatement (Second) of Torts* (1977), breach of express and limited warranties, and violations of the Tennessee Products Liability Act, Tenn.Code Ann. §§ 29–28–101 to –108 (1980 & Supp.1988).

Several of the Taylors' claims were eliminated during pretrial proceedings, including Paulette Taylor's. The A.O. Smith Corp. and Robert Brown were voluntarily dismissed as third-party defendants prior to trial. In the liability phase of the trial, the jury returned a verdict, finding in favor of the Taylors and against AOSHPI on the Taylors' theories of fraud, negligent and commercial misrepresentation, and strict tort liability. The jury awarded Taylor compensatory damages of $501,168.00 and 10 per cent prejudgment interest on the compensatory damages. It also awarded $500,000.00 in punitive damages.

The district court denied AOSHPI's motions for a directed verdict, JNOV, a new trial, and remittitur. On January 20, 1988, the district court entered a final judgment on the jury verdict for $1,090,703.60, and AOSHPI filed a timely appeal on February 18, 1988.

### B.

Taylor is a high school biology teacher at Clarkrange High School in Clarkrange, Tennessee. He holds a master's degree in education and was an experienced dairy farmer. He owned and operated a dairy farm near Clarkrange until 1985. On March 13, 1980, Taylor entered into a lease of approximately $230,000.00 for two Harvestore silos and loading and unloading equipment.

Harvestore silos are made of glass fused to steel panels. They are advertised as being an "oxygen-limiting" design. "Breather bags" inside the tops of the silos are designed to expand and contract to trap incoming air and keep silage from coming into contact with oxygen. They supposedly preserve silage longer and in better condition than conventional silos.

Taylor's typewritten lease contained a disclaimer in the preamble that stated in part:

> Buyer understands the conditions of the use of the products and is not relying on the skill or judgment of the Manufacturer or Seller in selecting them because Buyer acknowledges that farming and livestock feeding results are very much the product of individual effort combined with various climatic, soil, water, growing and feeding conditions which are beyond the control of the Manufacturer and Seller. Buyer recognizes that any advertisements, brochures, and other written statements which he may have read, including any farm profit plan which may have been shown to him, as well as any oral statement which may have been made to him, concerning the potential of the Harvestore and/or Slurrystore units and allied machinery and equipment, are not guarantees and he has not relied upon them as such because the products will be under Buyer's exclusive management and control.

The agreement also contained a section, immediately preceding the contract signature line, which provided:

ACKNOWLEDGMENT AND RE-LIANCE
I HAVE READ AND UNDERSTOOD THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER INCLUD-ING THE WARRANTIES, DISCLAIM-ERS AND TERMS AND CONDITIONS HEREIN GIVEN TO ME, EITHER BY THE MANUFACTURER OR THE SELLER. I RELY ON NO OTHER PROMISES OR CONDITIONS AND RE-GARD THAT AS REASONABLE BE-CAUSE THESE ARE FULLY ACCEPT-ABLE TO ME.

Taylor testified he read and understood the contract before he signed it. At trial, how-ever, he testified he relied on AOSHPI's representations regarding the oxygen-limit-ing design of the Harvestore silo, promised increased butterfat in his herd's milk, low-er labor and feed costs, and higher profits.

Prior to his use of the Harvestore silos, Taylor stated his herd was full of healthy cattle. After the system was installed in June 1980, however, his herd began experi-encing severe health problems, including decreased milk production, inability to re-produce, increased disease and death, and a general change from a healthy, thrifty ap-pearance to that of unthriftiness.[1]

The treating veterinarians, Dr. William Hall and Dr. Maben Thompson, testified that they believed there were no disease patterns in Taylor's herd that would ac-count for its health problems. Dr. Hall testified that the herd's health problems stemmed from malnutrition and poor feed. In his opinion, the Harvestore feed "didn't have enough energy." J.A. at 92. Hall testified that "[s]omething happened to the nutrients in the feed while the feed was inside the silage process, because apparent-ly good-looking haylage [was] put into the structure and then fed to cows [which] resulted in cows that were in poor nutri-tional condition and in a negative energy balance." J.A. at 96.

Similarly, Dr. Thompson testified the herd's health problems stemmed from nu-tritional problems with the feed stored in the Harvestore silos. Like Dr. Hall, Dr. Thompson believed the feed became nutri-tionally deficient because of fermentation problems in the Harvestore silos.

Lawrence Scott, an expert in animal nu-trition, and William McGee, a farm management expert, testified it was their opinions that Taylor's herd's problems were caused by the silos. They based their opinions on visits to the farm, reviews of farm records, lack of other diseases in the herd, and their prior experiences with Harvestore silos. Scott testified that the Harvestore silos damaged silage by allow-ing it to be exposed to excessive amounts of oxygen, at excessively high tempera-tures, which lowered its nutritional value. He noted Taylor's herd's milk production dropped almost immediately after it was fed from the Harvestore silos and in-creased after Taylor stopped using the si-los.

Taylor testified that before he used the Harvestores, his herd produced 5,298 pounds of milk a month. Thereafter, pro-duction dropped 2,268 pounds and never rose above 3,000 pounds again during the time he used the Harvestores. By the fall of 1981, cows which had produced about 40 pounds of milk a day before May 1980, were producing only 12 to 14 pounds per day. High-moisture corn he had kept in the Harvestore had become clumped with mold. The haylage he had kept in another Harvestore was usually moist but had a sweet smell, in sharp contrast to the pun-gent, vinegary odor of silage kept in con-crete silos. As his herd's milk production continued to decrease, Taylor testified it became virtually impossible to have any of his cows conceive. Taylor eventually dumped several thousand bushels of the high-moisture corn in the spring of 1982. After that, he stopped using the Harve-store silos.

This appeal presents the following is-sues: (1) did the district court err in failing to give effect to the disclaimer in the lease; (2) did the Taylors establish reliance on the alleged misrepresentations; (3) did the Tay-

---

1. Dr. Maben Thompson, a treating veterinarian, testified that "unthrifty" cows look thin, de-pressed, and have poor, dull coats.

lors establish actual and proximate causation between the alleged misrepresentations and the alleged damages; (4) did the Taylors proffer sufficient evidence to establish lost profits with a reasonable certainty; and (5) did the district court err in submitting the issue of prejudgment interest to the jury?

## II.

### A.

Review of a district court's denial of a motion for a directed verdict or JNOV is whether the evidence, viewed in the light most favorable to the nonmoving party, raises a material question of fact for the jury. *Fite v. First Tennessee Prod. Credit Ass'n*, 861 F.2d 884 (6th Cir.1988); *Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 826 (6th Cir.) (quoting *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979)), *cert. denied*, — U.S. —, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988). We must not pass on the credibility of witnesses, weigh the evidence, or substitute our judgment for that of the jury. *Frost*, 851 F.2d at 826.

Our review of a district court's denial of a motion for a new trial or a remittitur is limited to whether the decision is within the district court's sound discretion. *Fite, supra; Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1443 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *Moran v. Johns–Manville Sales Corp.*, 691 F.2d 811, 816 (6th Cir.1982). We will not disturb a decision to deny a new trial or remittitur absent a clear showing of abuse of discretion.

### B.

We begin our analysis by noting that many of the issues raised in this case have been addressed by this court before in *Agristor Leasing v. Saylor*, 803 F.2d 1401 (6th Cir.1986). To the extent that issues in this case are similar to those in *Saylor*, the prior published opinion is controlling. *See Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1088 n. 7 (6th Cir.1987) (Sixth Circuit tradi-

tion that reported panel opinions are binding upon subsequent panels), *cert. denied*, — U.S. —, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988); *Stone v. William Beaumont Hosp.*, 782 F.2d 609, 614 n. 4 (6th Cir.1986); *United States v. Eckman*, 581 F.2d 587, 588 (6th Cir.1978) (per curiam); Sixth Circuit Rule 24(b) (unpublished opinions only binding to establish res judicata, estoppel or law of the case in the present appeal).

■ AOSHPI argues the district court erred in failing to give effect to its "disclaimer of reliance." AOSHPI attempts to distinguish its "disclaimer of reliance" from the "disclaimer of liability" in the Agristor lease in *Saylor*. We find the claimed distinctions formalistic and ineffective in light of *Saylor* and Tennessee law, which gives no effect to disclaimers in the presence of fraud or negligent misrepresentations. *See Houghland v. Security Alarms & Sers., Inc.*, 755 S.W.2d 769, 773 (Tenn.1988); *Cooper Paintings & Coatings, Inc. v. S.C.M. Corp.*, 62 Tenn.App. 13, 20–21, 457 S.W.2d 864, 867–68 (1970).

■ AOSHPI argues it never represented the Harvestore silos to be oxygen free and, therefore, that Taylor should not be heard to claim he relied on representations that the silos would protect silage from oxygen. Second, AOSHPI argues that the promises in its advertising material, flyers, and films regarding increased butterfat in dairy herds, lower feed costs, lower labor costs, and higher profits were mere sales puffery, and, in any event, Taylor is precluded from arguing reliance because he expressly disclaimed reliance in the lease. We agree with the district court that Taylor produced enough evidence to raise jury questions of material fact.

AOSHPI's interoffice memoranda as far back as 1978 recognize a defective design in the Harvestore silos with regard to "oxygen-limiting," and resulting spoilage and secondary fermentation within the silo due to oxygen and high temperatures. Despite this, AOSHPI's promotional literature pressed the advantages of Harvestore silos, telling purchasers they could "believe" in the Harvestore design. But the reality,

as AOSHPI knew, was that grain stored in Harvestore silos was subject to excessive spoilage and secondary fermentation because of design flaws.

### C.

■ AOSHPI further argues Taylor never proved the Harvestore silos caused his herd's health problems. Again, we find Taylor proffered sufficient proof to raise a jury question. The two veterinarians who had treated Taylor's herd offered their expert opinions that the herd's health problems were caused by the nutritional deficiency of the feed stored in the Harvestore silos. Neither veterinarian found any disease pattern or other problems in the herd which would have caused the health problems, significant decrease in milk production, inability to conceive and reproduce, and increased disease and death. A nutritional expert testified that the Harvestore silos stored Taylor's feed in such a manner to cause it to become nutritionally deficient. In addition, Taylor and one of his treating veterinarians testified to the condition of the feed when it was first stored in the silos, when it was removed from them, and its lack of resemblance to nutritionally sound feed stored in conventional silos. The farm expert also testified that Taylor's herd's problems were caused by the silos.

### D.

■ AOSHPI argues that Taylor failed to prove his lost net profits to a sufficient certainty. It claims Taylor produced evidence as to lost gross revenue, but not net profits therefrom. Taylor counters that he supplied substantial evidence of what additional expenses he would have incurred in earning the lost gross revenue. Thus, the jury could subtract the amount of additional expenses from the lost gross revenue to arrive at the lost net profits. We agree. Taylor presented testimony regarding additional labor, utilities, and supplies that would have been required to produce the additional milk and generate the lost gross revenue. Moreover, Taylor presented evidence such as income tax returns from which additional veterinarian expenses,

utilities, supplies, and other farming expenses could have been calculated. This evidence satisfies the Tennessee standard that damages such as lost net profits be calculated to a reasonable degree of certainty. *Cummins v. Brodie,* 667 S.W.2d 759, 765 (Tenn.Ct.App.1983).

### E.

■ AOSHPI also contests the award of prejudgment interest in this case. Prejudgment interest in Tennessee as an element of damages is provided for in Tenn. Code Ann. § 47–14–123 (1988), which states in part that prejudgment interest may be awarded "as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten per cent (10%) per annum...." Prejudgment interest is discretionary in the view of the finder of fact. *B.F. Myers & Son of Goodlettsville, Inc. v. Evans,* 612 S.W.2d 912 (Tenn.Ct.App.1980).

Tennessee law permits the awarding of prejudgment interest on unliquidated claims for economic losses. *Coke v. United Transp. Union,* 631 S.W.2d 142, 146 (Tenn.Ct.App.1982); *Thayer v. Wright Company,* 50 Tenn.App. 515, 531, 362 S.W.2d 805, 812 (1961). In *Coke, supra,* for example, a union member received a judgment and prejudgment interest based on an alleged loss of compensation stemming from a change in hearing procedures which resulted in the plaintiff's hearing fewer cases and receiving less pay. The award of prejudgment interest was upheld despite the uncertainty as to how many hearings the plaintiff would have heard under the former procedures. Seen in this light, AOSHPI's demand for chronological precision in calculating the time over which the prejudgment interest accrued has no basis in Tennessee law. Moreover, from our review of the record, we note that the jury carefully considered the time frames within which it awarded prejudgment interest, and that at one point counsel for AOSHPI clearly indicated that he was satisfied with the jury's findings as to the manner in

which the jury had determined the time frames. T. XIX, page 74.

## III.

For the above reasons, the judgment of the district court is AFFIRMED in all respects.