976 F.2d 733
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
HARTLEY MARINE CORPORATION, Defendant-Appellant,
v.
David Earl HARRIS, Plaintiff-Appellee.
 No. 91-6324.
 United States Court of Appeals, Sixth Circuit.
 Sept. 15, 1992.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and COOK, Chief District Judge*.
 PER CURIAM.
 
 
 1
 Hartley Marine Corporation appeals the denial of its JNOV motion following a $50,000 jury verdict in a wrongful discharge diversity case brought by David Harris, who claimed that Hartley had fired him for halting the company's practice of cheating its fuel customers. We affirm the denial of the motion.
 
 I.
 
 2
 Hartley is an inland marine business in Kentucky which uses two barges to sell fuel to towboats midstream. Plaintiff Harris, an at-will employee, was Hartley's fuel manager. Central to the parties' trial and appeal arguments is the condition of Hartley's "prover" tank and the meters on board the fuel barges. This calibrated tank, which had a nominal capacity of 500 gallons, was periodically used to check the accuracy of the meters--that is, the amount the meters registered as being delivered to customers.
 
 
 3
 It is undisputed that for years, even before Hartley bought the operation, the meters were set forward to register 503 gallons against the 500 mark on the tank. Also undisputed are the results of tests performed on the meters and on the tank by employees of Kentucky's Department of Agriculture, Division of Weights and Measures. The significance of those test results in light of other (disputed) historical facts is vigorously contested. Since Harris's retaliation claim required the jury to find, as a predicate, that Hartley had been cheating its customers, we set forth the parties' arguments on the cheating issue and the supporting evidence each presented.
 
 
 4
 At trial, as on appeal, Hartley explained why the meters were set at 503 against the tank's 500 mark. In 1956, long before Hartley bought the business, its previous owner purchased a calibration tank that ostensibly held 500 gallons. According to testimony by the former owner, the tank was supposed to help the company keep track of the fuel it acquired and sold. The use of the tank did help reconcile inventory records and the amount of fuel actually on hand, but it still seemed that the company did not have as much fuel as its records indicated it should have. To solve the problem, the company experimented with various settings of the barges' meters. It discovered that setting the meters to record 503 gallons against the 500 gallon mark on the tank best reconciled the inventory records with the amount of fuel on hand. However, since measuring the amount of fuel in a barge is inherently difficult due to the effects of temperature variations and the barge's tilt, 1985-88 comparisons of the actual fuel on hand compared to inventory records showed that the company experienced fuel losses for two years and gains for two years. Overall there was a net gain of $5,216, or 0.0127 percent of total sales.
 
 
 5
 Wheeler, Hartley's vice president, testified that he was unaware that the meters were set forward to 503. Harris claims to have given Wheeler this information, and points out that everyone else at the small Hartley operation knew of the practice. The meters were not inspected by the state until 1985, three years after Hartley bought the business. Hartley had a similar operation in West Virginia where the meters had regularly been checked by outside sources. Both Harris and Wheeler claim credit for the decision to have the meters at its Kentucky facility certified. Hartley introduced the minutes of two staff meetings in late October 1985, which showed that Wheeler had directed Harris to have the meters checked by an outside source. Harris called Saybolt, a Louisiana company, but when he told Wheeler that Saybolt would charge $3,000 to certify the meters, Wheeler said that was too much to pay. Harris then called Ken's Meter Service, but failed to tell Wheeler about it and did not ask Ken's to check the meters. Harris claimed that he did not tell Wheeler because Ken's also cost too much. At trial, however, Harris testified that he never learned the cost of Ken's service. As it turned out, Ken's would have charged only one-fourth of Saybolt's fee.
 
 
 6
 Harris eventually called the Division of Weights and Measures and requested a meter inspection. Wheeler, contradicting deposition testimony, testified at trial that he did not know the state meter inspector was coming. Harris testified that just before the inspector's visit he ordered his crew to return the meters to the 500 setting.[1] Harris, although conceding that this was his order, points to conflicting testimony from other Hartley employees which suggests that no one really knew whether the meters were in fact returned to the 500 setting.[2] As explained below, the return of the meters to the 500 setting is critical to Hartley's defense.
 
 
 7
 Buddy Brooks was the state employee who tested Hartley's meters on November 7, 1985. His tests showed that the meter on each barge was "plussing"--in his words, "giving more than it's saying it's giving." (App. at 109). The amount of the error was + 120, meaning that the meters were giving away 120 cubic inches of fuel per Brooks' 100 gallon prover tank, or 2.6 gallons for every 500. Brooks then adjusted and sealed the meters. When he returned in succeeding years, he found the seals intact and the meters still accurate, which meant, as Harris puts it, that the meters correctly registered 500 gallons when 500 gallons passed through.
 
 
 8
 In testimony crucial to Harris's case, two of Hartley's maintenance workers, Willie Robinson and Frank Murphy, said that after the inspector's visit they decided to check the company's old prover tank against these newly-certified meters. Robinson said that the certified meters read 500 when checked against the 503 mark on the prover tank. Murphy said that the meters read 500 when checked against the 500 line on the tank. Even though these employees had different recollections, the mathematical significance of their testimony was clear, according to Harris. If it took 503 gallons according to the tank's gauge to make the certified and accurate meters register 500, then the tank must hold only 497 gallons at its 500 gallon line. Therefore, according to Harris, all those years when the company rolled the meters forward to 503 against the tank's 500 gallon mark it was "shorting" the customers by six gallons (per 500 gallons registered as having been sold). Alternatively, if Murphy's recollected figures were correct, Hartley was still cheating customers--but only by three gallons per 500. (If the tank had indeed held 500 gallons at the 500 gallon mark all along, setting the meters at 503 all those years had shorted customers by three gallons.) Harris argued that Robinson's testimony indicated that Hartley used both a cheater tank and cheater meters. Murphy's testimony, according to Harris, indicated that Hartley used only a cheater tank. Either way, Harris argued, Hartley had been cheating.
 
 
 9
 Hartley countered this evidence by pointing out that Robinson later testified on cross-examination that he had gotten the testing numbers "backwards," and that when he had said the newly-certified meters read 500 against 503 on the tank, he meant that 503 on the meters checked against 500 on the tank.[3] In addition to focusing on Brooks' "plussing" discovery, Hartley also relied on a test performed on its prover tank in 1986. A year after the meters were inspected, Hartley sent its prover tank to Frankfort, Kentucky, where it was inspected by Mark Whitaker, also of the Division of Weights and Measures. Whitaker testified that he filled the tank with a measured 500 gallons and found that the level fell short (by three gallons) of the 500 gallon mark. He verified this with a second test. Whitaker then lowered the tank's gauge plate so that the 500 mark on the gauge was positioned accurately.
 
 
 10
 Hartley argued that this evidence showed that the company had not been cheating when it had set the meters at 503 as against 500 on the prover tank, as 500 gallons on the tank equalled 503 on the meters. Harris argued that Whitaker's test was contradicted by Robinson's and Murphy's testimony, and pointed out that it was conducted a year after the meters were tested. For all we know, Harris argued, Hartley could have substituted a different tank, or perhaps Whitaker's testing equipment was faulty.
 
 
 11
 On the cheating issue, then, there was conflicting evidence regarding the setting of the meters just before the November 7, 1985, state certification, which arguably implicates the significance of Brooks' "plussing" findings. There also was contradictory testimony regarding the calibration mark on the prover tank when checked against the newly-certified meters--that is, whether the meters at 500 correlated with 503 on the tank, or vice versa. Thus, there was evidence both in support of the cheating allegation and evidence tending to refute it. Having found such a conflict, we are constrained to affirm the denial of the JNOV motion. In our review of the denial, we may inquire only "whether the evidence, viewed in the light most favorable to the nonmoving party, raises a material question of fact for the jury." Agristor Leasing v. A.O. Smith Harvestore Products, Inc., 869 F.2d 264, 269 (6th Cir.1989). It is not our place to "weigh the evidence or substitute our judgment for that of the jury," id., as Hartley essentially asks us to do by urging us to find that its proof was more compelling than Harris's and by arguing that Harris failed to exclude Hartley's "rational explanations." (Defendant's Brief at 28).
 
 II.
 
 12
 The same is true with respect to the second prong of Harris's case. The parties agree that, to complete his case, Harris had to show that the " 'reason for the discharge ... was [his] failure or refusal to violate a law in the course of employment.' " Grzyb v. Evans, 700 S.W.2d 399, 402 (Ky.1985) (citation omitted). Harris sought to establish this causation element by emphasizing that he had received excellent annual performance ratings until Wheeler learned that the state meter inspector was coming.[4] Harris showed that just before November 5, 1985, Wheeler had prepared his employee evaluations and had again ranked Harris the highest. The evaluation chart indicated, however, that on November 5--the time that Harris claimed Wheeler learned of the impending inspection--Wheeler crossed out Harris's No. 1 rating and replaced it with a 3. Harris also argued that the elapse of a year and ten months before his eventual termination does not controvert his causation claim; as he puts it, after November 5, 1985, "it was all downhill" for him at Hartley.
 
 
 13
 Hartley claimed that Harris was fired because he had purchased certain accessories for his company vehicle without permission, his peers had "lost confidence" in him, and he had charged the cost of a personal item (a motor for his swimming pool) to the company's account. Harris characterized these stated reasons as pretextual. He produced a document indicating that his purchase of the accessories had been authorized by Wheeler; he pointed out that there was no record of the purported loss of confidence and none of his peers had been called to corroborate this claim; and he presented evidence showing that it had been standard practice to allow employees to take advantage of the wholesale discounts available to the company, and that he had fully repaid Hartley for the cost of the motor.
 
 
 14
 Hartley attempted to refute Harris's "pretext" argument with an exhibit showing that the disputed accessories were not listed on the authorization form signed by Hartley's president and its car-leasing agent, which form pre-dated the one Harris introduced at trial. The car-leasing agent also testified that Harris had understood, as late as a week before the vehicle arrived, that it was not to be equipped with the accessories that Harris had requested. As to the swimming pool motor, Hartley emphasized the suspicious timing of Harris's repayment; his check to Hartley was dated the very day that another employee discovered that Harris had charged the motor to the company account.
 
 
 15
 Again, in its evaluation of the discrepant evidence, the jury could reasonably have accorded greater weight to Harris's exhibits and testimony and discredited Wheeler's explanation of the reasons behind Harris's termination. Given the plethora of supporting evidence adduced by each side, and the necessity of crediting Harris with "all reasonable inferences which may be drawn from [that] evidence," we cannot say that the district court erred in denying Hartley's motion for a JNOV. Lewis v. Bledsoe Surface Mining Co., 798 S.W.2d 459, 461 (Ky.1990).
 
 
 16
 AFFIRMED.
 
 
 
 *
 Honorable Julian A. Cook, Jr., United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The record does not reveal why Harris issued this order, nor does Harris offer any explanation on appeal
 
 
 [2]
 Assistant Maintenance Manager Frank Murphy said that he did not know whether the meters were then set at 500. Maintenance Manger Willie Robinson had testified at deposition that they were set at 503, but changed that figure to 500 at trial
 
 
 [3]
 We note, however, that the context of this exchange does not make it clear that Robinson was attempting to correct statements regarding his checking activity after the November 5 certification
 
 
 [4]
 Again, Wheeler claimed at trial not to have known of the inspector's scheduled visit, and Harris even testified that he had not so informed Wheeler. Harris argued, however, that Wheeler had otherwise learned that Harris had called in the state authorities, and Wheeler admitted that he had testified at his deposition that he had known of the inspection beforehand