P. Larue SIMPSON, Plaintiff,

v.

ERNST & YOUNG, Defendant.

No. C–1–91–196.

United States District Court, S.D. Ohio, Western Division.

April 21, 1994.

Janet Gilligan Abaray, Stanley Morris Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Larue Simpson.

Michael Samuel Glassman, Dinsmore & Shohl, Cincinnati, OH, Elizabeth B. Healy, Ernst & Young, New York City, for Ernst & Young.

Michael Samuel Glassman, Dinsmore & Shohl, Cincinnati, OH, for Gerry Hill.

### ORDER

STEINBERG, United States Magistrate Judge.

This case is before the Court following motions for summary judgment, arguments thereon, and responsive pleadings. (Docs. 162, 163, 165, 166). Plaintiff P. LaRue Simpson brings this action against Ernst & Young alleging claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*; Age Discrimination By Employers, Ohio Revised Code § 4101.17; the Employee Retirement Income Security Act (ERISA); as well as an Ohio common law unjust enrichment claim. The Court dismissed the latter claim. (Doc. 101).

Simpson contends that he was Ernst & Young's employee; therefore, this Court has jurisdiction over his ADEA, Ohio age discrimination, and ERISA claims. Ernst & Young contends that Simpson was a partner,

and, because these statutes apply only to employees, he has no claim as a matter of law. Following denial of both parties' initial motions for summary judgment, they consented to jury trial and entry of final judgment by the Magistrate Judge. A trial was held on the preliminary jurisdictional issue whether Simpson was an Ernst & Young employee. This resulted in a mistrial when the jury was unable to agree upon a verdict. (Doc. 154). Based on the trial evidence, the parties agreed there are no disputed questions of material fact on the jurisdictional issue and resubmitted it to the Court for summary judgment. The parties also submitted for summary judgment the issue whether Simpson was an employee within the meaning of ERISA. (Id.).

## UNDISPUTED FACTS

The following facts are gleaned from the trial evidence and exhibits and are undisputed.

Simpson, a Certified Public Accountant (CPA), was born on September 27, 1943. Ernst & Young is a large accounting firm created in 1989 by the merger of the Ernst & Whinney and Arthur Young accounting firms. Prior to his relationship with Ernst & Young, Simpson was the Managing Partner for Arthur Young's Cincinnati, Ohio office.

### I. The Ernst & Young Merger

In June 1989, Arthur Young distributed to its partners a Merger Agreement (Pl.Ex. 73) and an Information Document For Partners (Pl.Ex. 69). The Information Document represented that the "worldwide" combination of Arthur Young and Ernst & Whinney would result in the largest and strongest international professional services firm in the world. (Id., p. 3). The two firms were described as being compatible because, among other things, they "care for individuals by promoting and recognizing them based on performance" and have "mutual respect among partners." (Id., p. 5). Both were estimated to have good increases in their 1990 and 1991 cash earnings, despite merger costs. (Id., p. 36). The Information Document represented that Arthur Young partners would receive equal or better benefits under the Ernst & Young retirement plan. (Id., p. 55). Arthur Young and Ernst & Whinney represented to their partners and the public that the merger was not expected to result in a reduction in partners. (Doc. 144, p. 289).

The merger vote was conducted by signed ballot. Simpson voted in favor of the merger. At the time of the vote, no options were presented for the continuation of Arthur Young, and the merger was strongly recommended by those in high management positions.

On October 1, 1989, the merger was effected. The merged firm organized itself into two entities: Ernst & Young and Ernst & Young U.S. The Ernst & Young Partnership Agreement (the Partnership Agreement) required the signatories, who are termed "Partners," to be CPAs and to sign a second agreement, the Ernst & Young U.S. Partnership Agreement (the U.S. Agreement). The signatories to the U.S. Agreement were not termed "Partners," but were denominated "Parties" and consisted of individuals who were both CPAs and non-CPAs. The CPAs were referred to as "Capital Account Parties," and the non-CPAs were termed "Investment Account Parties."

### II. The Merged Firms' Management

A Management Committee consisting of ten to fourteen Parties and a Chairman was responsible for the management of Ernst & Young U.S. (Pl.Ex. 46, Sec. 3(a), (d)). Its responsibilities included addition or discharge of Parties, decisions on mergers and acquisitions, allocation of earnings among the Parties, and appointment or removal of the Chairman. (Id., Sec. 3(d)). The Chairman selected new members of the Management Committee subject to the approval of the other members of the Management Committee and the Advisory Council. (Id., Sec. 3(a)). The Advisory Council consisted of the Chairman, not more than four members of the Management Committee, and eighteen other members elected by the Parties. (Id., Sec. 5(a)). It served in an advisory capacity to the Management Committee. (Id., Sec. 5(c)).

As an Ernst and Young U.S. Party, Simpson had one vote for each vacancy on the Advisory Council. (Id., Sec. 5(b)). A

Nominating Committee, appointed by the Management Committee, nominated one Party for each vacancy as it occurred on the Advisory Council. Advisory Council nominees were unopposed. (Id.).

The makeup of Ernst & Young's Management Committee was identical to the Ernst & Young U.S. Management Committee. (Pl. Ex. 75, Sec. 2(b)). Upon the selection of a member to the Ernst & Young U.S. Management Committee, that person automatically became a member of Ernst & Young's Management Committee. (Id.) The Management Committee was responsible for Ernst & Young's general management. (Id., Sec. 2(a)).

### III. The Parties' Investment In Ernst & Young U.S.

Both Capital Account Parties, such as Simpson, and Investment Account Parties were required to contribute funds into a Capital Account or an Investment Account, respectively. The Management Committee determined the amount each Party was required to contribute. (Pl.Ex. 46, Sec. 6(a)). Simpson appears to have contributed $84,000 to his Capital Account. (Df.Ex. 527). The Parties "capital contributions" were accomplished without any out-of-pocket expense to them. Ernst & Young U.S. arranged with Citibank to borrow the capital contribution funds on the Parties' behalf. (Pl.Ex. 69, p. 55). The firm did not guarantee these loans. (Doc. 147, p. 449). It did, however, pay the periodic interest due from the Parties to Citibank and debited the parties' accounts accordingly. (Id., p. 450). In addition, the Parties earned interest on their "capital contributions," which Ernst & Young U.S. paid to them.[1] The Parties were required to reduce the balance of their Accounts ten percent per year beginning the third year after the merger. (Id., p. 443).

Regarding Ernst & Young, the Partnership Agreement states that "At [sic] October 1, 1989, the amount of the Capital Account of each Partner shall be established by the Management Committee." (Pl.Ex. 75, Sec. 4(a)). Simpson did not establish a capital account for this entity.

Upon dissolution of Ernst & Young U.S., the Management Committee will determine the amount owing to former Parties and current Parties. (Pl.Ex. 46, Sec. 18). Upon dissolution of Ernst & Young, the Management Committee, in its discretion, will allocate to the Partners the liquidation proceeds. (Pl.Ex. 75, Sec. 9).

As a Capital Account Party, Simpson was stated to be jointly and individually liable for the losses of Ernst & Young U.S. (Pl.Ex. 46, Sec. 19); as a Partner, he was stated to be jointly and individually liable for Ernst & Young losses. (Pl.Ex. 75, Sec. 10).

### IV. Simpson's Earnings

Ernst & Young U.S. paid Simpson an annual salary in an amount the Management Committee determined, which was charged as a business expense. (Pl.Ex. 46, Sec. 8(b)). For state tax purposes, Ernst & Young U.S. treated Simpson's salary as just that—a salary. (Doc. 147, p. 449). For federal tax purposes, however, Ernst & Young U.S. reported his salary on a Schedule K–1 as a distribution of partnership earnings. For the 1990 tax year, Simpson represented in his federal tax return that Ernst & Young U.S. was a partnership and that he was a partner.

The Partnership Agreement did not reference a payment of salary; it stated that Ernst & Young's profits and losses, if any, were allocated as the Management Committee in its sole discretion determined. (Pl.Ex. 75, Sec. 4(b)). Simpson, however, received no compensation from Ernst & Young.

In addition to a salary, Ernst & Young U.S.'s Management Committee determined the amount of an "allocation" payable to each Party. (Pl.Ex. 46, Sec. 8(b)). This allocation was based on performance, level of responsi-

---

1. Prior to the merger, Parties were to be paid interest on the Capital and Investment Accounts at approximately the prime rate. (Pl.Ex. 69, p. 54). Pursuant to the U.S. Agreement, the Parties received a "special earnings allowance" from Ernst & Young U.S., based on its use of the Capital and Investment Account funds at such rate as the Management Committee established. (Pl.Ex. 46, Sec. 9). The firm treated this allowance as a payment of interest. (Doc. 147, pp. 504–05).

bility, years of service, and other factors. (Pl.Ex. 69, p. 54).

## V. Simpson's Rights

As an Ernst & Young U.S. Party, Simpson had the right to vote on proposed major firm combinations in the manner determined by the Management Committee (Pl.Ex. 46, Sec. 17). He had the right to vote on amendments to the U.S. Agreement (Id., Sec. 22). He also had the right to vote on the dissolution of Ernst & Young U.S. (Id., Sec. 18). The Advisory Council, however, was responsible for approval of any matter submitted to the Parties for vote. (Id., Sec. 5(c)(v)). As an Ernst & Young Partner, Simpson had the right to vote for the dissolution of Ernst & Young. (Pl.Ex. 75, Sec. 9). He also had the right to vote on any amendment to the Partnership Agreement. (Id., Sec. 13).

Simpson did not have the right to vote for members of the merged firms' Management Committees, see supra, pp. 650–51; however, the Management Committee nominees were made known to Simpson and other members of Arthur Young and Ernst & Whinney prior to the merger. (Pl.Ex. 69, p. 27; Pl.Ex. 73, p. 6).

Arthur Young partners had the right to an accumulated UBT, which was to be paid to them over an eight year period following withdrawal or retirement from that firm. UBT was an acronym for unbilled time and uncollected fees. (Pl.Ex. 69, p. 56). As a former partner of Arthur Young, Simpson retained ownership of his Arthur Young UBT account after the merger. Neither Ernst & Young nor Ernst & Young U.S. gave Simpson any UBT rights.

Simpson did not have the right to examine the books, records, or accounts of Ernst & Young U.S. or Ernst & Young, except to the extent that the Chairman or Management Committee might permit. (Pl.Ex. 46, Sec. 20(e); Pl.Ex. 75, Sec. 7(d)). He was also required to maintain a will providing that his heirs and personal representatives would accept as correct the entities' accounts without examination or verification of the books and records. (Id.).

Simpson had no right of access to legal opinions issued by Ernst & Young's general counsel; general counsel did not consider Simpson to be his client. Ernst & Young claimed attorney-client privilege to prevent Simpson from obtaining a relevant legal memorandum written by·its general counsel to the Management Committee prior to Simpson's termination from Ernst & Young. (Doc. 46).

Simpson was unable to sign promissory notes binding the respective entities. (Pl.Ex. 46, Sec. 20(a)(i); Pl.Ex. 75, Sec. 7(a)). He could not assign, pledge, or otherwise transfer his interest in either entity. (Pl.Ex. 46, Sec. 20(b); Pl.Ex. 75, Sec. 7(b)). He could not become a director or executive of any corporation other than non-profit or charitable organizations without the consent of the Chairman. (Pl.Ex. 46, Sec. 20(a)(ii)). He also could not make any loan or advance any of his funds to another Party or employee of Ernst & Young U.S. (Id., Sec. 20(a)(iii)).

As an Ernst & Young U.S. Party, Simpson was required to have his performance reviewed annually by his supervisor. He was not entitled to know other Ernst & Young U.S. Parties' compensation.

The U.S. Agreement contains a detailed section entitled "Retired Parties," which addresses, among other items, payments to Retired Parties. (Pl.Ex. 46, Sec. 12). The U.S. Agreement also contains a detailed section entitled "Disability." (Id., Sec. 13). The Partnership Agreement does not address these issues.

Following the merger, Simpson lost his position as Managing Partner in charge of the Cincinnati office and was named Director of Entrepreneurial Services for that office, a lesser position. Simpson did not have authority to operate Entrepreneurial Services according to his own discretion. He was obligated to implement a national strategic plan under the authority of the Cincinnati Office's Managing Partner. He could not transfer, hire, or fire Entrepreneurial Services personnel. Simpson was also involved in the development of a marketing plan for the Cincinnati office. He had no authority to sign the firm's name to an audit. Nor did he have authority to accept new clients for the firm.

## VI. Simpson's Discharge

At the time of the merger, an analysis of the merged firms' retirement benefit plans showed that the accumulated benefit obligations were $290,000,000 higher than the funding then available. (Doc. 144, pp. 279–80, 285). Despite representations that the merger was not expected to result in a reduction in "partners" (Id., p. 289), the Management Committee had concluded that a substantial number of "partners" would have to be discharged. An October 5, 1989 memorandum from Ernst & Young's first Management Committee meeting indicated "excess professional staff capacity to be about 8%" and stated that the "Plan is to act on 5% excess by November 15 ..." (Pl.Ex. 30). The agenda for the December 18, 1989 Management Committee meeting included items entitled "Partner movement and retention" and "1990 Partner Admissions." (Pl.Ex. 31). "Partner movement" meant discharging partners as well as partner retirement. (Doc. 144, p. 250).

The December 18, 1989 Management Committee agenda included a list of former Arthur Young partners by age, showing the total number of years with Arthur Young, the total number of years as a "partner," and any break in service. (Pl.Ex. 35). These are items considered in determining whether a Party has worked the years necessary to vest in a retirement plan. (Doc. 144, pp. 263–64). The February 21, 1990 Management Committee agenda addressed "Partner resignations and retirements" as well as the "1990 Partner recommendation process." (Pl.Ex. 37). Regarding the former, the agenda included a table entitled "Comparison of Partner Ages in Fiscal 1990," which grouped partners by age. (Id.). Ernst & Young Management Committee member Jesse Miles stated that the firm engaged in a "process of resignations and retirements" to reduce the number of "partners" ... "in order to protect the firm from substantial reduction in profits." (Doc. 144, p. 266). He characterized the process as a "lay off." (Id., p. 291).

When asked whether the Management Committee considered a freeze on the admission of new partners or a reduction in the earnings of present partners as an alternative to discharging current partners, Miles testified that would have been "a dumb move." (Id., p. 261). He stated the firm did not want to lose its recently hired accountants or its ability to attract accountants. "And you encourage bright, capable young people to join the firm with the objective of success. And success is called partnership in a major accounting firm. And in order to keep those people attracted, making adequate income and wanting to stay with the firm, they have to be able to know that they stand a chance of becoming partners." (Id., p. 262).

The Management Committee had the right to request Simpson to terminate his relationship with Ernst & Young U.S. by giving him six months written notice. (Pl.Ex. 46, Sec. 11(a)). Simpson had no right to appeal his discharge or the discharge of any other Party. Upon discharge, the Management Committee determined the net amount owing to a Party. That determination was final and binding. (Id., Sec. 11(b)).

During the period October 1, 1989 through March 25, 1991, Ernst & Young U.S. discharged approximately 127 Parties while hiring approximately 122 new accountants. (Pl. Ex. 109). In May 1990, Ernst & Young U.S. requested Simpson's resignation. He refused, and on June 19, 1990, he was given written notification that he was discharged effective December 19, 1990. He was then 46 years old.

The amount due Simpson upon discharge was calculated in December 1990, nine months prior to the end of Ernst & Young's fiscal year. (Doc. 147, p. 508).

## OPINION

### I. The Court Should Apply Traditional Partnership Law Concepts In Determining Whether Simpson Was A Partner Or An Employee

Pursuant to 29 U.S.C. § 623(a)(1), it is "unlawful for an employer ... to discharge any individual ... because of such individual's age." The Act defines an employee as "an individual employed by any employer." 29 U.S.C. § 630(f). An employer is defined

as "a person engaged in an industry affecting commerce who has twenty or more employees ..." 29 U.S.C. § 630(b). Title VII of the Civil Rights Act of 1964, which prohibits discrimination against employees because of race, color, religion, sex or national origin, provides no further guidance on the definition of "employee." 42 U.S.C. § 2000e *et seq.*[2] These definitions are circular and explain nothing. *Nationwide Mutual Insurance Co. v. Darden,* —— U.S. ——, ——, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992). Nevertheless, it is clear that ADEA, Title VII, and AWDA serve to protect "the enormously important right to equal employment," *LeMasters v. Christ Hospital,* 777 F.Supp. 1378, 1379 (S.D.Ohio 1991) (Spiegel, J.), and to eradicate from the workplace the evil of discrimination on account of an individual's age, race, color, religion, sex, national origin, or handicap. *See Armbruster v. Quinn,* 711 F.2d 1332, 1340 (6th Cir.1983).

Ernst & Young asserts that neither Simpson nor any other Party discharged during 1990 and 1991 is entitled to the protection afforded by the employment discrimination laws because these individuals are not employees, but partners. The inescapable logic of this position is that Ernst & Young claims to be free to discriminate against hundreds of its accountants due to age, race, sex, religion, national origin, and handicap because it asserts they are not employees.

Simpson, who considered himself to be a partner during his employment with Ernst & Young, now contends that he was actually an employee, as that term is defined in the law, and did not meet the legal definition of partner. He seeks the protection of the age discrimination laws. Relying on *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936–37, 6 L.Ed.2d 100 (1961), and *Armbruster,* 711 F.2d at 1339–40,

Simpson contends that the Court should use an "economic reality" test rather than traditional legal concepts in determining whether he was a partner or employee. The Sixth Circuit has described this test as "a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Lilley v. BTM Corporation,* 958 F.2d 746, 750 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992).

Ernst & Young contends that an economic reality test is not the appropriate means to determine whether an individual is a partner or employee and that Simpson's status must be determined by the application of traditional partnership law concepts. Ernst & Young claims Simpson possessed both "essential and non-essential" attributes of a partner. It argues that whatever partnership characteristics Simpson lacked, he voluntarily delegated them to the Management Committee and their absence did not destroy his partner status.[3] Therefore, it claims, the Court has no jurisdiction over his age discrimination claims.

The Supreme Court developed the economic reality test in a Fair Labor Standards Act (FLSA) case. *See Goldberg,* 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100. In so doing, it relied on FLSA's provision that the term "employ" includes "to suffer or permit to work," 29 U.S.C. § 203(g), a definition not found in ADEA, Title VII, or AWDA. The Sixth Circuit has applied the economic reality test to determine whether an individual was an employee rather than an independent contractor under the employment discrimination laws, *see Lilley,* 958 F.2d 746; *Armbruster,* 711 F.2d 1332, but has not yet addressed the partner vs. employee question. Nor has the Supreme Court addressed the issue.

---

**2.** ADEA was enacted to fill the gap left by Title VII, which did not address age discrimination. The prohibitory language in ADEA is strikingly similar to that of Title VII and many courts have relied on Title VII precedent to interpret ADEA. *See e.g., EEOC v. Elrod,* 674 F.2d 601 (7th Cir. 1982). The Americans With Disabilities Act (AWDA) similarly prohibits discrimination against disabled individuals. 42 U.S.C. § 12101 *et seq.*

**3.** This Court has previously rejected Ernst & Young's contention that Simpson's use of the term "partner" in his complaint constitutes a judicial admission of his employment status. (Doc. 101, pp. 9–10). The Court also found that Simpson's vote in favor of the merger and his signing the Partnership Agreement and U.S. Agreement have no significance in the determination of his employment status. (Id., p. 10).

In *Nationwide Mutual Insurance Co. v. Darden*, — U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), decided after the aforementioned cases, the Supreme Court unanimously ruled that traditional agency law criteria should be used to determine whether the plaintiff was an independent contractor or an employee under ERISA. In so ruling, the Court rejected its reasoning in previous cases decided under the National Labor Relations Act, *NLRB v. Hearst*, 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1944), and Social Security Act, *United States v. Silk*, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947), which, applying the economic reality test, held "employee" was construed more broadly than the common law definition. *Darden*, — U.S. at ——, 112 S.Ct. at 1349. The Court noted that Congress amended the National Labor Relations Act to effectively nullify the *Hearst* decision and require the application of traditional agency principles in distinguishing employees from independent contractors. Id. As a result, in 1989, the Supreme Court abandoned its emphasis on construing "employee" in light of the mischief to be corrected and the end to be attained by the statute in question in favor of a traditional legal definition. Id., *citing Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

The Court distinguished the economic reality test applied in FLSA cases, *see Goldberg*, 366 U.S. 28, 81 S.Ct. 933; *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), because unlike ERISA, FLSA contained an "expansive" definition of the verb employ to mean "suffer or permit to work." *Darden*, — U.S. at ——, 112 S.Ct. at 1350. The Court further rejected the use of a test based upon the claimant's expectations as begging the question whether he held employee status, because such an approach would "compromise the capacity of companies . . . to figure out who their 'employees' are and what . . . their pension fund obligations will be." Id.

Because ADEA, Title VII, and AWDA also lack FLSA's "expansive" definition of the verb "employ," *Darden* indicates that the Sixth Circuit's use of the economic reality test in employment discrimination cases may be in error. Although neither the Supreme Court nor the Sixth Circuit has addressed the proper test to be used to distinguish partners from employees, *Darden* strongly counsels the use of traditional legal principles to determine this issue rather than a broader test.

Under *Darden's* traditional agency law principles test, numerous factors regarding the employment relationship are considered, and no one factor is decisive. — U.S. at ——, 112 S.Ct. at 1349. The Supreme Court approved the following factors in an analysis of whether Darden was an independent contractor or employee: 1) the hiring party's right to control the manner and means by which the product is accomplished; 2) the skill required by the hired party; 3) the source of instrumentalities and tools; 4) the location of the work; 5) the duration of the relationship between the parties; 6) the hiring party's right to assign additional projects; 7) the hired party's discretion over when and how long to work; 8) the method of payment; 9) the hired party's role in hiring and paying assistants; 10) whether the work is part of the hiring party's regular business; 11) whether the hiring party is in business; 12) the hired party's employee benefits; and 13) tax treatment of the hired party's compensation. *Darden*, — U.S. at ——, 112 S.Ct. at 1348. The application of these factors to this case would result in a finding that Simpson was an employee. The agency test, however, is more relevant to the independent contractor vs. employee issue than to the partner vs. employee issue, because Simpson was an agent of Ernst & Young, whether he was a partner or an employee.[4]

What is pertinent about *Darden's* agency law test is the Court's comparison of the independent contractor characteristics the claimant possessed to his employee characteristics when deciding whether he was an independent contractor or an employee. No one factor is controlling. The *Darden* rationale also rejects the premise that if the claimant possessed any characteristics of an independent contractor, he could not be con-

---

4. A partner is an agent of the partnership. N.Y. PARTNERSHIP LAW § 20 (McKinney 1988).

sidered an employee under the traditional agency law test. Ernst & Young has cited, and we have found, no case standing for the proposition that if a claimant possesses any characteristics of a partner, this precludes him/her from being an employee.

Although the traditional agency law test is not applicable to the partner vs. employee cases, one common thread exists between the latter cases and the independent contractor vs. employee cases: bona fide independent contractors and partners are employers, not employees. As an employer, an individual is not entitled to ADEA or ERISA coverage.

■ We do not view the *Darden* analysis as a quantitative test where the Court simply adds up employee and employer attributes a claimant possessed. Rather, it must be a qualitative test to determine whether the claimant actually met the traditional legal definition. In order to determine whether Simpson was a bona fide partner, we must examine the traditional legal concepts of partnership.

## II. Traditional Partnership Law Concepts

The parties agree that New York law applies to the Ernst & Young organization. Both the Partnership Agreement and the U.S. Agreement state that their construction is in accordance with the laws of the State of New York. (Pl.Ex. 75, Sec. 12; Pl.Ex. 46, Sec. 21). In New York, traditional partnership concepts are codified in N.Y. PARTNER-SHIP LAW § 1 *et seq.* (McKinney 1988) and are set forth in the state's case law.

A partnership is an "association of two or more persons to carry on as co-owners a business for profit." N.Y. PARTNERSHIP LAW § 10 (McKinney 1988). Thus, a bona fide partner is one who owns the business, i.e., an employer.

While sharing the firm's gross receipts does not establish a partnership, id., § 11(3), sharing the firm's net profits may be prima facie evidence that one is a partner. Id., § 11(4). No such inference may be drawn, however, if the share of profits was received in payment of a debt, as employee wages, or as loan interest even though the amount of

payment varied with the profits of the business. Id.

Partners are jointly liable for all partnership debts and obligations. Id., § 26. A partner contributes toward the partnership losses according to his proportionate share in the profits. Id., § 40(1).

A partner is repaid his capital contribution and shares equally in the partnership's profit after all liabilities are satisfied. Id.

A partner receives interest on his/her capital contribution only from the date when repayment should be made. Id., § 40(4).

The partnership must indemnify a partner. Id., § 40(2).

All partners have equal rights in the management and conduct of partnership business. Id., § 40(5).

No person may become a member of a partnership without the consent of all partners. Id. § 40(7).

While any difference arising as to ordinary matters connected with the partnership may be decided by a majority of the partners, no act in contravention of the agreement between the partners may be done without the consent of all partners. Id., § 40(8).

Subject to any agreement between the partners, the partnership books are kept at the principal place of the partnership's business. Id. § 41. Every partner must have access to and may inspect and copy any of the partnership records. Id. A partner has a duty to render, on demand, all information affecting the partnership. Id., § 42.

■ Partners owe a fiduciary duty to one another. Id., § 43. The nature of the fiduciary duty is such that each partner owes to the others the highest degree of fidelity, loyalty, and fairness in their mutual dealings. *Application of Lester,* 87 Misc.2d 717, 386 N.Y.S.2d 509 (Sup.Ct.1976). Because of this fiduciary duty, in their dealings with one another partners cannot fall back on morals of the marketplace. *Auld v. Esteridge,* 86 Misc.2d 895, 382 N.Y.S.2d 897 (Sup.Ct.1976), *aff'd,* 58 A.D.2d 636, 395 N.Y.S.2d 969 (App. Div.), *appeal denied,* 43 N.Y.2d 641, 401 N.Y.S.2d 1025, 371 N.E.2d 830 (1977).

The property rights of a partner are: 1) his rights in specific partnership property; 2) his interest in the partnership; and 3) his right to participate in the management of the partnership. Id., § 50. As to specific partnership property, a partner is co-owner with his partners as a tenant in partnership. Id., § 51. A partner's interest in the partnership is his share of the profits and surplus. Id., § 52.

While N.Y. PARTNERSHIP LAW § 40 implies that certain partnership rights may be delegated by agreement, the following rights set forth in other sections are not delegable:

The right to access, inspection, and copying of partnership books, id., § 41;

The duty of partners to render to another partner on demand true and full information of all things relating to the partnership, id., § 42;

The fiduciary duty one partner owes another, id., § 43;

The right to participate in the management of the partnership, id., § 50, even though a partner may delegate his equal share of management and operations, id., § 40(5);

The right of a partner to be a co-owner of partnership property, § 51; and

The right to share the profits and surplus, id., § 52.

The Uniform Partnership Act (UPA) has been adopted by most states, including New York in 1919, as the governing body of partnership law. It sets forth, among others, the following characteristics of a partner: unlimited liability (§ 15); the right to share in profits and participate in management (§ 18(a), (e)); the right and duty to act as an agent of the other partners (§ 9); shared ownership (§ 6); and fiduciary relationship among partners (§ 21). The drafters of the UPA used the term "co-owners" to indicate that each partner has "the power of ultimate control." UNIF. PARTNERSHIP ACT § 6 official cmt., U.L.A. (1969).

The concurring opinion in *Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), also provides some guidance as to the nature of partnership. There, Justice Powell reasoned that the relationship among partners should not be characterized as an employment relationship to which Title VII may apply:

The relationship among law partners differs markedly from that between employer and employee.... The essence of the law partnership is the common conduct of a shared enterprise. The relationship among law partners contemplates that decisions important to the partnership normally *will be made by common agreement ... or consent among the partners.*

Id. at 79–80, 104 S.Ct. at 2236 (emphasis added). Critical to this concept of a professional partnership is the partners' authority to make decisions important to the partnership. The mere labeling of an individual as a partner does not make him so. Id. at 80, n. 2, 104 S.Ct. at 2236, n. 2. *See also EEOC v. Peat, Marwick, Mitchell & Co.,* 589 F.Supp. 534, 539 (E.D.Mo.1984), *aff'd,* 775 F.2d 928 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

Ernst & Young cites the following cases in support of its contention that the protections of ADEA do not extend to members of professional organizations, such as Simpson. Most of these cases provide little guidance.

In *Burke v. Friedman,* 556 F.2d 867, 869 (7th Cir.1977), a Title VII action brought against an accounting firm, the Seventh Circuit, with little analysis, concluded that "we do not see how partners can be regarded as employees rather than as employers who own and manage the business." The Seventh Circuit neither questioned the plaintiff's status as a partner nor did it set forth any facts relative to the plaintiff's relationship with her accounting firm.

In *EEOC v. Dowd & Dowd, Ltd.,* 736 F.2d 1177 (7th Cir.1984), a Title VII action brought against a law firm, the Seventh Circuit extended its holding in *Burke* to encompass shareholders in a professional corporation based on the rationale that the "management, control, and ownership" of a professional corporation is much like the "management, control, and ownership" of a partnership. Id. at 1178. As in *Burke,* the Seventh Circuit in *Dowd & Dowd* did not question the plaintiff's status as an owner/shareholder nor

did it discuss what management, control, or ownership rights the plaintiff possessed.

*Hyland v. New Haven Radiology Associates, P.C.,* 794 F.2d 793 (2nd Cir.1986), also offers no guidance as to what characteristics an employer should possess. In that case, the Second Circuit concluded that, since the plaintiff-physician was a member of a professional corporation, he must be an employee and covered by ADEA. Id. at 798. The Second Circuit found any inquiry into the plaintiff's partnership status to be irrelevant. Id.

On the other hand, *Wheeler v. Hurdman,* 825 F.2d 257, *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), relied upon by Ernst & Young, is instructive. Wheeler brought an action against her accounting firm claiming age and sex discrimination. Although Wheeler conceded her status as a partner, she contended that she was also an employee under ADEA and Title VII. The Tenth Circuit reversed the district court's application of the economic reality test and instead relied upon the Uniform Partnership Act. It recognized that an individual cannot be both a *bona fide partner* and an employee under ADEA or Title VII. Id. at 277 (emphasis added). After delineating the attributes of a bona fide partner, the Court concluded that the "total bundle of partnership characteristics" differentiated partners from employees. Id. at 276.

The Court listed factors which distinguished Wheeler's partnership from her prior position as an employee with the firm: 1) participation in profits and losses; 2) exposure to liability; 3) investment in the firm; 4) partial ownership of firm assets; 5) voting rights; 6) position under the partnership agreement; and 7) position under partnership laws. Id. Wheeler possessed the following partnership attributes: she had signed a partnership agreement; her compensation was not a salary but a share of the firm's profits paid by draw and an allocation of profits based on points; she made a genuine capital contribution; she had unlimited personal liability for partnership debts; she had the right to vote on dissolution, large mergers, admission of new partners, partner termination, shares of net profits, special distributions, and any other allocation of income; she could sign audits and tax returns; and she was reimbursed for certain club dues. Id. at 260.

Implicit in the Tenth Circuit's decision is the concept that, had Wheeler possessed something less than the "total bundle of partnership characteristics," she would not have been considered a bona fide partner, even though the firm so denominated her. Wheeler possessed more characteristics of a partner than did Simpson. See detailed discussion *infra,* pp. 659–64. Aside from the cases Ernst & Young cited, the following cases are also pertinent.

In *Fountain,* 925 F.2d 1398, the issue was whether the plaintiff was a partner or an employee of his accounting firm under ADEA. The Eleventh Circuit held:

> [W]e look to the particular circumstances of the case at hand, (citation omitted) and, in so doing, we focus not on any label, but on the actual role played by the claimant in the operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control and ownership.

Id. at 1400–01. Looking beyond corporate nominclature, the Court found Fountain, one of four shareholders in a professional corporation, to be a partner based on the following facts: 1) he was compensated on the basis of a share of the firm's profits; 2) he was liable for certain debts of the firm; and 3) he had the right to vote proportionate to his ownership share on amendments to the agreement, admission of new partners, termination of partners, and distribution of profits and income. Id. at 1401. Fountain possessed more characteristics of a partner than Simpson.

In *Caruso v. Peat, Marwick, Mitchell & Co.,* 664 F.Supp. 144 (S.D.N.Y.1987), the issue was whether the plaintiff was a partner or an employee of his accounting firm under ADEA. The District Court rejected a per se rule exempting individuals termed partners from ADEA protection, because such a rule would allow employers to strip employees of their ADEA rights simply by calling employees partners without giving them any deci-

sion-making authority or job security. Id. at 148. The Court also reasoned that the adoption of such a rule would prevent invocation of ADEA by physicians, accountants, attorneys, and other professionals who have traditionally organized their businesses as partnerships. The Court held there is nothing in the legislative history of ADEA or other anti-discrimination statutes which suggests that these statutes should not apply to such professionals, noting that the Senate rejected an amendment to Title VII which would have exempted physicians. Id., *citing EEOC v. Rinella & Rinella,* 401 F.Supp. 175, 180–81 (N.D.Ill.1975).

The *Caruso* Court focused on three traditional partnership law factors: 1) the extent of the claimant's ability to control and operate his business; 2) the extent to which the claimant's compensation was calculated as a percentage of the firm's profits; and 3) the extent of the claimant's employment security. 664 F.Supp. at 149–50. The Court denied the defendant's motion to dismiss and motion for summary judgment based on the following facts: Caruso did not hold a management position; he could make few discretionary decisions on behalf of his clients without management approval; he was required to submit time sheets; he received a set period of vacation time every year; he was subject to formal job evaluation; he could make no personnel decisions on his own initiative; he held no ownership interest in the firm; he received a base salary plus additional compensation based upon a number of assigned units (he held 350 units on a scale of 175 to 3300); his voting power was determined by the number of his units; and, although he had the power to block a partnership appointment, he had no right to question management's decision to discharge a partner. Id. at 145–46, 149–50; and *Caruso v. Peat, Marwick, Mitchell & Co.,* 717 F.Supp. 218, 219–20, 222–23 (S.D.N.Y.1989). He was ultimately found to be an employee following a jury trial. *Caruso v. Peat, Marwick, Mitchell & Co.,* 779 F.Supp. 332, 333 (S.D.N.Y. 1991). Caruso's job attributes were similar to Simpson's; however, Caruso had more partnership characteristics than Simpson. Simpson did not receive compensation based on a pro rata share, nor did he have the power to block a partnership appointment. *See* detailed discussion *infra,* pp. 659–64.

■ Although *Wheeler, Fountain,* and *Caruso* were decided prior to *Darden,* they do not conflict with its rationale. In each case, the court reviewed traditional partnership law factors which differentiate partners from employees. Ernst & Young argues that only the "essential" elements of partner status should be considered, which it identifies as sharing profits and unlimited personal liability. It deems other partnership indicia, such as capital contribution, ownership interest, and meaningful participation in partnership decisions to be non-essential. Traditional partnership law concepts do not support this selective categorization of partnership indicia. All factors should be considered, with no one factor being decisive. *See Darden,* —— U.S. at ——, 112 S.Ct. at 1349; *Wheeler,* 825 F.2d at 276.

We now turn to examine the partner vs. employee characteristics Simpson possessed.

### III. Simpson Was An Employee Subject To ADEA Protection

#### A. Simpson Did Not Make A True Capital Contribution To The Firm

Simpson never established a capital account with Ernst & Young. Therefore, we give no weight to the Partnership Agreement's reference to a Capital Account.

Simpson established an Ernst & Young U.S. Capital Account. Simpson's "capital" payment into this account was arranged by Ernst & Young and financed by Citibank. This "capital contribution" generated interest payments from Ernst & Young U.S. rather than a pro rata share of the profits. The Capital Account was not the basis for a Party's pro rata share of either profits or firm assets. (Doc. 147, p. 512). Thus, Simpson's payment to Ernst & Young U.S. was more akin to a loan than a capital contribution.

Gary Stewart, a CPA and expert in the field of CPA business organizations, testified at trial that Simpson did not contribute capital but rather loaned money to Ernst & Young U.S. (Doc. 146, pp. 367–68). Stewart's opinion was based on several factors: 1) the

definition of "firm capital" in Section 7 of the U.S. Agreement indicates that "amounts owing to Parties" are treated as a firm liability rather than as owner's equity (id., p. 365); 2) when a Party withdraws from the firm, he receives only what he paid in plus interest, rather than a percentage of the value of the firm (id., p. 366); and 3) the firm paid interest to the Parties on their Capital Accounts. (Id.)

We view Simpson's Capital Account as a paper transaction designed to give him the appearance, but not the reality, of a partner. On its face, his substantial payment ($84,000) appears to be a capital contribution to the firm. However, Simpson did not invest one cent of his own money in the firm. The firm arranged the bank loan that Simpson signed and paid the interest on his behalf. He made no payments on the principal. Although the U.S. Agreement bound him to begin reducing the principle in his third year with Ernst & Young U.S., he was discharged before then. Although he was liable to the bank for the principal, his Capital Account at the firm was available to, and ultimately did, satisfy the debt. His yearly earnings and discharge payment were not based on the proportion $84,000 contribution had to total capital investment in the firm. It appears that the primary significance of his Capital Account was not to establish Simpson's ownership interest, but to generate funds for the firm. As of the date of Simpson's termination, he had not made a true capital contribution to the firm.

### B. Simpson Did Not Share In The Firm's Profits and Losses

Simpson received no compensation from Ernst & Young. Therefore, we give no weight to the reference in the Partnership Agreement that its profits be allocated among its Partners.

Simpson received an annual salary from Ernst & Young U.S., as determined by the Management Committee. The U.S. Agreement does not identify Simpson as a partner and specifically refers to his compensation as "salary." For state tax purposes, Ernst & Young U.S. treated Simpson's compensation as salary. For federal tax purposes, however, it treated it as a partnership distribution of earnings. This is of little significance, because under Internal Revenue Code regulations, a partnership is considered to be anything which is not a corporation, trust, or estate. 26 C.F.R. § 301.7701–3(a). Simpson's salary did not vary based on the rise and fall of firm profits. There was no evidence that Simpson or any other Party were required to return any amount of salary due to declining profits. Nor was there evidence that his salary was calculated as a proportionate share of the firm's profits.

In addition to his salary from Ernst & Young U.S., Simpson was eligible to receive an "allocation" each year, also determined by the Management Committee. Neither party discussed in their memoranda the relative amounts of Simpson's salary compared to his allocation or its significance. Pursuant to the U.S. Agreement, a Party could receive advances against his/her allocation, but would have to return any advances in the event that they exceeded the allocation. The separate denominations and treatment of salary and allocation indicate that the two items are different. There is no evidence, however, that allocations were calculated from net profits or even from gross receipts. Nor is there evidence that Simpson's allocation was calculated as a *proportionate* share. (Pl.Ex. 46, Section 8(a), (b)). The U.S. Agreement fails to set forth any formula for calculating allocations, leaving the determination instead to the Management Committee. Id. Since Simpson had no right to an accounting as to how his allocation was calculated, he did not have the ability to offer evidence on this issue. It is fair to infer that, had Simpson's allocation been calculated from his proportionate share of net profits, Ernst & Young would have introduced that favorable evidence. Therefore, we conclude the allocation was comparable to a periodic bonus paid to an employee at the firm's discretion from the firm's gross revenues. *See Caruso,* 664 F.Supp. at 150.

In contrast to Simpson, the plaintiff in *Wheeler,* found to be a partner, received a share of the firm's profits and an allocation of profits based on points. *Wheeler,* 825 F.2d at 260. The plaintiff in *Fountain,* found to be a partner, shared in the firm's profits,

losses, and expenses and was compensated on the basis of a share in the firm's profits. *Fountain,* 925 F.2d at 1401.

### C. Simpson Had No Other Indicia Of An Ownership Interest In The Firm

Ernst & Young contends that Simpson's ownership rights in the firm are demonstrated by his UBT account. The UBT account, however, is not indicative of his relationship with Ernst & Young since this account was a carry-over from his prior relationship with Arthur Young. Neither Ernst & Young nor Ernst & Young U.S. utilized UBT accounts. Their failure to continue a UBT arrangement demonstrates that the firms, rather than their members, owned the accounts receivable. (*See* Pl.Ex. 69, p. 56).

Ernst & Young also contends that Simpson had a contingent undivided interest in all firm assets, citing the U.S. Agreement, Section 18. That section, however, applies only upon dissolution or liquidation of the firm. When Simpson left the firm, Ernst & Young U.S. calculated his compensation in December, nine months prior to the firm's fiscal year end, using an estimate based on the prior year's figures. (Doc. 147, pp. 508–09). Thus, Simpson's discharge compensation was not measured by any ownership interest in the firm's assets but was a salary. Furthermore, Section 18 states that, upon dissolution or liquidation, the amount owing to each Party shall be computed pursuant to Section 11. The latter does not provide for a distribution of an undivided interest in firm assets. Rather, it awards a Party the amount of his Account, as determined by the Management Committee; any allocations or interest the firm owes the Party; and the Party's proportionate allocation for the current fiscal year, less any liability the Party owes the firm, plus an "earnings charge" pursuant to Section 9 computed by the Management Committee. Simpson did not possess an undivided interest in firm assets.

Ernst & Young claims that Simpson's ownership interest in the firm is shown by his rights regarding the firm's operations. It points to the fact that Simpson could vote for amendments to the Partnership Agreement and the U.S. Agreement, dissolution of the firm, certain mergers, and members of the Advisory Council. Simpson's voting rights, however, were illusory because the Advisory Council had the right to approve and thus, implicitly, to veto any vote put to the Parties. Simpson's right to vote for members of the Advisory Council was perfunctory since the candidates were unopposed and selected by the Nominating Committee which, in turn, was selected by the Management Committee. Furthermore, the Advisory Council had no direct authority to act, serving only in an advisory capacity to the Management Committee. The Chairman selected the members of the Management Committee without any vote of the Parties, and the Management Committee selected the Chairman. The Chairman and the Management Committee managed the firm. Thus, as a practical matter, the Parties had no power to alter decisions of the Chairman and the Management Committee.

Even more illuminating are the issues for which Simpson had no vote. He had no vote for Management Committee membership. He had no vote for the admission of new partners. He had no vote on the discharge of existing partners, including himself. Finally, he had no vote on how firm members were to be compensated.

In contrast, the plaintiffs in *Wheeler* and *Fountain,* who were found to be partners, had specific voting rights regarding the admission and termination of partners and the distribution of profits. *Wheeler,* 825 F.2d at 260; *Fountain,* 925 F.2d at 1401. *See also Maher v. Price Waterhouse,* No. 84–1522 C(2), 1985 WL 9500 (E.D.Mo. April 8, 1985). Even the plaintiff in *Caruso,* who was ultimately found to be an employee, had more voting rights than Simpson, as he had the power to block a partnership appointment. *Caruso,* 664 F.Supp. at 146.

### D. Simpson Had No Right To Examine The Firm's Books And Records

■ Simpson did not have the unconditional right to examine the firm's books and records, and he was denied access to them regarding the UBT accounts. He had no right to learn the other Parties' compensation. A basic tenant of a bona fide partnership is that every partner shall at all times

have access to and may inspect and copy partnership books. N.Y. PARTNERSHIP ACT, § 41 (McKinney 1988); *Romeo v. Russo*, 31 A.D.2d 935, 299 N.Y.S.2d 7 (App.Div.1969). Although some other emoluments of partnership are, under the New York Partnership Act, implicitly delegable, this section is not subject to variation by agreement of the parties. *Newburger, Loeb & Co., Inc. v. Gross*, 365 F.Supp. 1364, 1369 (S.D.N.Y.1973).

### E. Simpson Had Little, If Any, Management Authority

Contrary to Ernst & Young's conclusory contentions, Simpson had few rights regarding Ernst & Young U.S.'s operations. He did not have the authority to hire, fire, or transfer even clerical workers within or without his department. The operations strategy of his department was determined by a superior. Simpson was subject to annual performance reviews. To the extent involvement in a firm's operations is indicative of being a bona fide partner, the evidence shows that Simpson's partnership interest in Ernst & Young U.S. was slim, at best. *Compare Fountain*, 925 F.2d at 1399 *with Caruso*, 664 F.Supp. at 146, 150. *See also Hishon*, 467 U.S. at 79–80, 104 S.Ct. at 2236 (concurring opinion).

### F. There Was No Fiduciary Relationship Between The Management Committee And Simpson

Partners bear a fiduciary relationship to each other. *Auld v. Esteridge*, 86 Misc.2d 895, 382 N.Y.S.2d 897 (Sup.Ct.1976), *aff'd*, 58 A.D.2d 636, 395 N.Y.S.2d 969 (App.Div.), *appeal denied*, 43 N.Y.2d 641, 401 N.Y.S.2d 1025, 371 N.E.2d 830 (1977), *citing Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928) (Cardozo, J.). *See also* N.Y. PARTNERSHIP LAW § 43 (McKinney 1988). The main elements of fiduciary duty are the utmost good faith, the highest fidelity, fairness, and loyalty. *Newberger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057 (S.D.N.Y.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *In re Grace's Will*, 61 Misc.2d 1064, 308 N.Y.S.2d 136 (Sup.Ct.1970). Ernst & Young's refusal to permit Simpson to examine books and records regarding UBTs and to obtain its attorney's opinion regarding

Simpson's discharge demonstrate an absence of a fiduciary relationship between the Management Committee and Simpson.

The Management Committee's act, at the time of the merger, of privately planning to "lay-off" Parties, while at the same time assuring them good increases in 1990 and 1991, equal or better benefits, and no reduction in partners (Pl.Ex. 69, pp. 3, 5, 36; Doc. 144, p. 289), is a vivid example of the absence of a fiduciary relationship. Simpson's discharge and that of 126 other Parties was done for two stated economic reasons: 1) to protect the continued profit of firm members who were not discharged; and 2) to encourage recruitment and retention of younger accountants, who were generally paid less, were farther away from retirement, and needed assurance they would rise to partnership status. (Doc. 144, pp. 262, 266). The failure of Ernst & Young to choose other options, such as not admitting as many new accountants, or reducing Parties' compensation, belies its contention that Simpson was a bona fide partner to whom the Management Committee owed a fiduciary duty. Since bona fide partners share in profits and losses proportionately, N.Y. PARTNERSHIP LAW §§ 26, 40(1), a reduction in all Parties' compensation would have been consistent with the existence of a fiduciary relationship. "Layoff" of Parties to preserve other Parties income is not. The fact that the Management Committee was simultaneously considering hiring accountants and terminating Parties is also indicative of the absence of a fiduciary relationship.

There is a degree of permanence associated with the status of partner that is absent from the status of employee. *See Wheeler*, 825 F.2d at 274. The element of co-ownership of the firm and consequent fiduciary relationship and employment security inherent therein is absent when some Parties can be discharged, without any voice in the matter, in order to insure the financial gain of other Parties.

### G. The Firm Did Not Actually Consider Simpson A Co–Owner

We are not persuaded by Ernst & Young's contention that Simpson delegated certain management responsibilities. We acknowl-

edge that the N.Y. PARTNERSHIP LAW, § 40(5), permits delegation of such duties, and we agree that the larger the partnership, the more delegation is to be expected. *See Wheeler,* 825 F.2d at 273. Simpson, however, could not delegate rights he never possessed. Furthermore, at some point, delegation destroys partner status. While it may have been "normal business caution" to prevent Simpson from binding the firm to promissory notes by his signature and from pledging firm assets, or to require reviews of certain audits or the engagement of new clients, it was not "normal business caution" to prevent him from voting on substantive matters, to deny him a proportionate share of firm profits, to eliminate his share in the firm's accounts receivable, to deny him personnel authority, to prevent him from examining the firm's books, and to prevent him from learning what legal advice the firm's attorneys provided.

### H. Simpson Agreed To Unlimited Liability For Partnership Losses

The U.S. Agreement and the Partnership Agreement provide that Simpson was jointly and individually liable for the losses of Ernst & Young U.S. and Ernst & Young respectively. On its face, this is a characteristic of partnership. It certainly cannot, however, be considered a benefit of partnership. Furthermore, there is no evidence that Simpson or any other Party was ever called upon to accept responsibility for losses of Ernst & Young U.S. or Ernst & Young. We question the enforceability of this provision in light of the apparent lack of consideration therefor. It seems inequitable to hold an individual liable for the losses of his "partners" when that individual has no choice in determining who his partners are, no power to control the risks his "partners" take, and no right to examine the firm's books to determine what his liabilities might be. With these qualifications, Simpson's unlimited liability is a partnership attribute.

### I. Simpson Was Not A Bona Fide Partner; He Was An Ernst & Young Employee

Although Simpson was termed an Ernst & Young partner, he had no financial investment in, and received no compensation from that entity. Simpson loaned $84,000 to Ernst & Young U.S. and received a salary and bonus from that entity. Ernst & Young U.S., however, did not refer to Simpson as a partner, but rather as a "Party." While labeling a person "partner" does not make him so, the failure to term Simpson a partner, when he had been thus denominated at Arthur Young, is an indication that he was not intended to be a partner. Simpson lacked any meaningful control and voting rights in Ernst & Young U.S., did not share in the firm's profits and losses, did not enjoy a fiduciary relationship with the Management Committee members, and had no other ownership rights therein.

In view of all the factors analyzed *supra,* pp. 659–63, with no one factor being dispositive, we find, under a traditional partnership law analysis, that Simpson has many qualitative characteristics of an employee and few, if any, attributes of a bona fide partner. Therefore, we find Simpson was an employee protected against age discrimination under ADEA.

In addition to our finding being directed by traditional legal principles, it is also an equitable result, putting Simpson on par with other business executives and professionals who have held positions of greater responsibility in their firms than Simpson and who were found to be protected by ADEA. *See, for example, Hawley v. Dresser Industries, Inc.,* 958 F.2d 720 (6th Cir.1992); *Hyland v. New Haven Radiology Associates, P.C.,* 794 F.2d 793 (2d Cir.1986); *Gorman v. North Pittsburgh Oral Surgery Associates, Ltd.,* 664 F.Supp. 212 (W.D.Pa.1987). Particularly instructive in this regard is *Barnhart v. Pickrel, Schaeffer & Ebeling, Co., L.P.A.,* 12 F.3d 1382 (6th Cir.1993), decided in this District, and affirmed by the Sixth Circuit. Barnhart, an "executive attorney" and shareholder in a law firm, was in charge of the firm's litigation department and had been a senior partner until the firm changed from a partnership to a professional corporation.[5]

---

5. As a shareholder, Barnhart was entitled to vote    his capital stock regarding the election and ter-

The District Court's decision that Barnhart was an employee under ADEA (*Barnhart*, No. 90–CV–330, 1992 WL 551487 (S.D.Ohio) (Bertelsman, J.)) was undisturbed on appeal to the Sixth Circuit.

### J. It Is Not Necessary To Resolve Simpson's Contention That Ernst & Young Is Not Actually A Partnership

Simpson also contends that both the U.S. Agreement and the Partnership Agreement fail to establish bona fide partnerships; therefore, he is not a partner. Simpson has presented substantial evidence in this regard, much of which has been discussed above. Simpson contends that the Partnership Agreement has no specific provision regarding the distribution of earnings; it does not result in the establishment of a capital account; it provides no voting procedure for the election of the Chairman or Management Committee; and it specifically restricts the rights of the Partners to sign promissory notes or to examine the firm's books. With regard to the U.S. Agreement, Simpson contends that it has been carefully crafted to avoid creating a partnership because it includes non-CPAs as parties and state laws prohibit CPAs and non-CPAs from representing themselves as partners. The fact that we have found Simpson to be an employee does not, in and of itself, justify the conclusion that Ernst & Young and Ernst & Young U.S. are not partnerships.[6] Because we have resolved the jurisdictional issue by finding Simpson to be an employee, it is not necessary to go further to decide whether either the entities Ernst & Young or Ernst & Young U.S. are in actuality partnerships.

### IV. Because Simpson Was An Employee, He Is Subject To The Protection Afforded Under O.R.C. § 4101.17(B)

■ Ohio's counterpart to the ADEA, O.R.C. § 4101.17(B), which prevents age discrimination against "any employee," is interpreted in accordance with ADEA. *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir.1988), *appeal after remand*, 914 F.2d 258 (6th Cir.1990). In view of the above, Simpson's age discrimination claim under the Ohio statute also withstands Ernst & Young's motion for summary judgment.

### V. As An Employee, Simpson Was Subject To ERISA

There exist four retirement plans in which Simpson may be eligible for benefits: 1) a retirement plan described in the U.S. Agreement, Section 12; 2) a H.R. 10 Plan (Keough Plan); 3) UBT rights in accordance with his Arthur Young position; and 4) a Defined Benefit Retirement Plan (also known as the "five year qualified plan"). Ernst & Young concedes that the latter includes both partners and non-partners and, therefore, is an ERISA retirement plan. (Doc. 166, p. 29).

■ ERISA does not apply to retirement plans which cover only partners. 29 C.F.R. § 2510.3–3(b) and (c)(2). *See also Robertson v. Alexander Grant & Co.*, 798 F.2d 868, 871 (5th Cir.1986), *cert. denied*, 479 U.S. 1089, 107 S.Ct. 1296, 94 L.Ed.2d 152 (1987). Ernst & Young contends that the three remaining retirement plans at issue involve only partners; therefore, they are not subject to ERISA. Simpson contends that he is an

---

mination of officers, dissolution of the firm, amendments to the firm's code of regulations, and the employment and termination of other attorneys in the firm. (*Barnhart*, No. 90–CV–330, 1992 WL 551487, Defendants' Motion For Summary Judgment, p. 18). The District Court decided the preliminary jurisdictional issue in plaintiff's favor, finding his position to be more akin to that of an employee than an employer or partner. (Id., Opinion and Order filed May 26, 1992, p. 4). The Court granted the firm's motion for summary judgment on the merits of the age discrimination claim, and Barnhart appealed. The issue whether Barnhart was an owner or employee was not directly before the Sixth Circuit, because the firm did not cross appeal. The

issue was discussed, however, in Barnhart's appellate brief. (*See* Doc. 163, p. 35). Since the issue is jurisdictional in nature, the Sixth Circuit implicitly affirmed the District Court's decision that Barnhart was an employee by finding that he established a prima facie case. Barnhart possessed far more indicia of an employer than Simpson.

6. Although we do not answer the question, it is possible that the Management Committee constitutes a partnership, with the remaining Parties being employees of the partnership. It is also possible that Ernst & Young or Ernst & Young U.S. are non-partnership business associations.

employee; therefore, the plans are subject to ERISA. Under *Darden,* a traditional legal test should be applied in determining whether an individual is an employee under ERISA. Our finding above that Simpson is an employee and not a partner means he is also subject to ERISA protection.[7]

## CONCLUSION

Simpson had few, if any, meaningful attributes of a partner. For all practical purposes, he was an employee with the additional detriment of having promised to be liable for the firm's losses. Ernst & Young was free to draft its Partnership Agreement and U.S. Agreement in such a way as to generate the belief in its employees that they enjoyed partnership status and to permit them to represent themselves as partners. However, because these individuals actually had no bona fide ownership interest, no fiduciary relationship, no share in the profits and losses, no significant management control, no meaningful voting rights, no meaningful vote in firm decisions, and no job security, they were not bona fide partners. Therefore, Ernst & Young was obligated not to discriminate against them because of their age, sex, race, religion, national origin, or handicap.

IT IS THEREFORE ORDERED THAT:

1) Ernst & Young's motion for summary judgment is DENIED; and

2) Simpson's motion for partial summary judgment is GRANTED.

3) The case shall proceed to jury trial on Simpson's federal and state age discrimination claims and to bench trial on his ERISA claims.

---

**7.** The retirement plan embodied in the U.S. Agreement includes CPAs and non-CPAs. The latter do not bear joint and individual liability for firm losses. Ernst & Young's position has always been that joint and individual liability is an "essential" indicia of partner status. The inclusion of the non-CPAs in this plan is further evidence that it is within the ambit of ERISA. *See Robertson,* 798 F.2d at 871–72.