**P. Larue SIMPSON, Plaintiff–Appellee,**

v.

**ERNST & YOUNG, Defendant–Appellant.**

**No. 95–3209.**

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1996.

Decided Nov. 8, 1996.

Janet G. Abaray (argued and briefed), Theodore N. Berry, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, for Larue Simpson.

Michael S. Glassman, Dinsmore & Shohl, Cincinnati, OH, Thomas L. Riesenberg, Asst. Gen. Counsel (argued and briefed), Washington, DC, for Ernst & Young.

Kathleen B. Burke (briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, Glen D. Nager, Jones, Day, Reavis & Pogue, Washington, DC, Stephen F. Smith, Sidley & Austin, Washington, DC, for Dickinson, Wright, Moon, Van Dusen & Freeman, Dykema Dykema Gossett P.L.L.C., Fulbright & Jaworski L.L.P., Gibson, Dunn & Crutcher, Jones, Day, Reavis & Pogue, Mayer, Brown & Platt, O'Melveny & Myers, Paul, Hastings, Janofsky & Walker, Seyfarth, Shaw, Fairweather & Geraldson, Shearman & Sterling, Skadden, Arps, Slate, Meagher & Flom.

Before: KRUPANSKY, DAUGHTREY, and MOORE, Circuit Judges.

KRUPANSKY, J., delivered the opinion of the court, in which MOORE, J., joined. DAUGHTREY, J. (p. 445), delivered a separate concurring opinion.

KRUPANSKY, Circuit Judge.

This action concerns the 1990 discharge of an individual from a large accounting firm. Appellee Peyton Larue Simpson ("Simpson")

sought federal judicial redress for his termination by appellant Ernst & Young ("Ernst & Young"), alleging federal claims for violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., and a supplemental state claim under the Ohio law that bars age discrimination, Ohio Rev.Code § 4101.17 (Anderson 1989).

Simpson filed this lawsuit on March 25, 1991 seeking damages pursuant to ADEA, 29 U.S.C. § 621 et seq., which protects employees who are forty years or older from age-based discrimination. He also sought damages pursuant to ERISA, 29 U.S.C. § 1001 et seq., charging that his termination was intended to deny him participation in certain Ernst & Young retirement plans and was imposed in retaliation for his persistent inquiries concerning his post-merger retirement benefits. Included in Simpson's complaint were causes of action for violation of the Ohio age discrimination statute, Ohio Revised Code § 4101.17 (Anderson 1989), and for unjust enrichment.

Following discovery, the parties filed cross-motions for summary judgment. Ernst & Young argued that Simpson was a partner rather than an employee of the firm; consequently, his action was not cognizable pursuant to ADEA and ERISA. The district judge to whom the case was initially assigned observed that "labeling plaintiff a 'partner' does little to illuminate the actual nature of his employment relationship with Ernst & Young." He concluded in his well-reasoned opinion of March 26, 1993 that whether Simpson was "an employee within the meaning of the ADEA," turned on "plaintiff's actual role in the management, control, and ownership of Ernst & Young,"—all disputed issues of material fact to be decided by a jury. The district judge bifurcated the case for trial with its first phase limited to determining if Simpson was an Ernst & Young "partner" or "employee." On December 6, 1993, the parties consented to a trial and entry of final judgment of all issues in the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Following the parties' consent order, a four-day jury trial before the court deadlocked, and resulted in a mistrial on December 20, 1993. The parties thereafter agreed to resubmit the case on cross-motions for summary judgment addressing the "partner versus employee" issue upon the testimony, exhibits, and record that had been developed during the jury trial. Upon the record in its entirety, the trial judge decided that Simpson was an "employee" for purposes of ADEA, ERISA, and Ohio Rev.Code § 4101.17. *Simpson v. Ernst & Young,* 850 F.Supp. 648 (S.D.Ohio 1994).

In reviewing this resolution of the ADEA and ERISA claims, this court initially notes that the distinction between a "partner" and an "employee" under both ADEA and ERISA is a preliminary jurisdictional issue. *See Waxman v. Luna,* 881 F.2d 237, 240 (6th Cir.1989). In the absence of a conflict of material fact, it is appropriate for the court to resolve the issue as a matter of law. *Lilley v. BTM Corp.,* 958 F.2d 746, 750 at n. 1 (6th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992). In the instant case, the parties stipulated that no conflict of material fact existed as to this issue and submitted it to the court on cross motions for summary judgment to be decided as a matter of law. This court reviews that court's determination *de novo. Waxman,* 881 F.2d at 240.

Following the resolution of the "partner versus employee" issue, the trial court convened a jury to consider the merits of plaintiff's ADEA claim. On May 12, 1994, the jury returned a verdict wherein it concluded that age had been a "determining factor" in Simpson's discharge and that Ernst & Young's ADEA violation was "willful." The jury awarded plaintiff past earnings, past benefits, future earnings, and future benefits. Although the trial court denied plaintiff prejudgment interest on his federal ADEA claim (because a prevailing plaintiff may not recover both liquidated damages and prejudgment interest under the ADEA), on October 28, 1994, it permitted him to recover prejudgment interest on past earnings and benefits pursuant to the Ohio age discrimination law. Ohio Rev.Code § 4101.17 (Anderson 1989).

Earlier, on September 23, 1994, the trial court had addressed plaintiff's ERISA claim and resolved that Simpson's discharge was in retaliation for persistent requests for information concerning his retirement benefits under the merger. The court awarded Simpson ERISA damages which were set off against the ADEA claim. Defendant moved unsuccessfully for judgment notwithstanding the verdict of the jury and a new trial on January 18, 1995, but filed this timely appeal.

■■■ The trial court's summary judgment ruling is reviewed *de novo*. *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388 (6th Cir.1993). The jury verdicts returned in these proceedings are reviewed pursuant to the "sufficient evidence" rule. *See Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.*, 869 F.2d 264, 269 (6th Cir.1989). The legal issues inherent to the ERISA claim are reviewed *de novo*, and its factual issues are reviewed for clear error. *Schwartz v. Gregori*, 45 F.3d 1017, 1021 (6th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995). Resolutions concerning prejudgment interest and front pay are reviewed for abuse of discretion. *Shore v. Federal Express Corp.*, 42 F.3d 373, 380 (6th Cir.1994).

■■ A brief summary of the facts that gave rise to this controversy reflects that on October 1, 1989, the accounting firm of Arthur Young & Co. ("Arthur Young") merged with Ernst & Whinney to form a mega-firm known as Ernst & Young. The proposed merger was presented to participating personnel of Certified Public Accountants (CPAs) and non-CPAs, i.e. lawyers, computer analysts, and individuals with advanced academic degrees in business administration in both firms via various pre-merger documents asserting that (1) there would be no major head count or staff reductions as a result of the merger, (2) the merger would result in equitable or better retirement benefits for all concerned, and (3) both predecessor firms anticipated that the merger would result in an increase in cash earnings and significant growth opportunities for all concerned. Upon these representations of the merger promoters, affected personnel were requested to execute commitments styled Agreement of the Parties—U.S. ("U.S.Agreement"), which defined the terms and conditions of their participation in the newly-created firm of Ernst & Young. The U.S. Agreement characterized CPAs as Capital Account Parties and non-CPAs as Investment Account Parties. The CPAs were each required to execute second documents styled Ernst & Young Partnership Agreement ("Partnership Agreement").

Contrary to the circulated pre-merger commitments, an Ernst & Young Management Committee, a council that had been formed in accordance with the complicated documentation of the combined U.S. Agreement and Partnership Agreement, secretly voted within days of the completed merger to eliminate "excess staff capacity" by 5%, and proceeded within the next two months to systematically discharge older partners. (Ex. 30; Tr. 5/24/94 at 1078; Tr. 12/8/93 at 249; Exs. 31–37). Simpson, who was a signatory to both the U.S. Agreement and the Partnership Agreement, was among those individuals requested to resign.

Plaintiff was born on September 27, 1943. Beginning in 1972, he worked for KMG/Main Hurdman ("KMG/MH"), an accounting firm where he had become the managing partner. In December 1986, Arthur Young acquired KMG/MH. He became the Cincinnati Managing Partner for Arthur Young. Following the 1989 merger with Ernst & Whinney, Gerald Hill ("Hill") replaced Simpson as the Cincinnati Managing Partner of Ernst & Young. Simpson was named to the lesser position of Cincinnati Director of Entrepreneurial Services.

It should be noted that, at the time of the merger, the combined firms had a projected unfunded retirement obligation which exceeded $290 million. By eliminating older partners before their interest in this pension vested, the newly-formed firm could avoid substantial unfunded accrued contingent retirement liabilities.

Preliminary to the announcement of its systematic discharge of older partners, the Management Committee had covertly directed the preparation of a comparative study captioned "Comparison of Partner Ages in

Fiscal 1990," which included a subsection styled "Partner Resignations and Retirement." Another section considered by the Committee was "The Partner Recommendation Process," which addressed the admission of younger partners. The Committee's analysis ignored reducing partner compensation or freezing new partner admissions in favor of methodically eliminating older partners. Significantly, a member of the Management Committee testified that "it would be dumb" to lower compensation or freeze new partner admissions rather than discharge older partners. He testified further that it was necessary to discharge Simpson and other older partners to make room for the "bright young people." With this reflected mindset, the Management Committee terminated 120 partners over the age of 40 during an ensuing 18–month period while admitting 162 new partners under 40 years of age. Simpson was replaced by a partner under the age of 40.

To justify Simpson's discharge, Ernst & Young advanced a purported conflict of interest arising out of an undisclosed pre-merger personal home loan mortgage that he carried with a bank that subsequently became a firm client. Both the trial court and the jury rejected this argument as pretextual and specious, especially since an Ernst & Young internal investigation had absolved Simpson of any impropriety or wrongdoing. Moreover, the record disclosed that the only material information of interest to the Management Committee prior to terminating Simpson was his age and years of service with the firm, and his tenacity in pursuing his post merger retirement benefits.

In considering the issue of Simpson's status of "partner" or "employee" within the context of the ADEA and ERISA, the trial court found that the promoters of the merger prevailed upon Simpson and other personnel similarly situated to execute documents designed to centralize all power to manage the newly-created firm and its assets through an intentionally ambiguous business structure calculated to divest Simpson and others similarly situated of all indicia of meaningful partnership participation in the new firm. The characterization of "partner" was a title

that carried no legal significance which could be disclaimed when convenient to the defendant's management. Simpson and his similarly situated colleagues were relegated to the position of an employee subject to the virtually absolute, unilateral control of the Management Committee.

To support its conclusion that Simpson was an employee rather than a partner in the newly-created firm of Ernst & Young for purposes of both the ADEA and ERISA, the trial judge found that Simpson had no authority to direct or participate in the admission or discharge of partners or other firm personnel; participate in determining partners or other personnel compensation predicated upon performance levels, responsibility, and years of service with the firm, including his own; participate in the vote for the chairman or the members of the Management Committee; or participate in the firm's profits and losses or share in unbilled uncollected client accounts ("UBT's"). Simpson had no right to examine the books and records of the firm except to the extent permitted by the Management Committee. He was required to execute a will which mandated that his heirs accept as binding the accounts provided by Ernst & Young with no right of inspection or verification. He had no authority to sign promissory notes on behalf of the firm, or pledge, transfer, or otherwise assign his interest in the firm. He was refused access to data concerning various client accounts. He was denied participation in annual performance reviews and other indicia of partnership status.

In sum, the firm's business, assets, and affairs were directed exclusively by a 10 to 14 member Management Committee and its chairman. The Management Committee exercised exclusive control over the admission and discharge of all personnel, including Simpson. It could terminate employees without cause and without a right to appeal such decisions. The Management Committee unilaterally determined the compensation of all personnel, which authority was exercised and executed in total secrecy. Simpson and those similarly situated had no vote for the chairman or the members of the Management Committee. Instead, the Management

Committee appointed its chairman and its chairman appointed the members of the Management Committee. In assessing Simpson's status as a "partner" or "employee," the trial court concluded that:

Simpson had few, if any, meaningful attributes of a partner. For all practical purposes, he was an employee with the additional detriment of having promised to be liable for the firm's losses. Ernst & Young was free to draft its Partnership Agreement and U.S. Agreement in such a way as to generate the belief in its employees that they enjoyed partnership status and to permit them to represent themselves as partners. However, because these individuals actually had no bona fide ownership interest, no fiduciary relationship, no share in the profits and losses, no significant management control, no meaningful voting rights, no meaningful vote in firm decisions, and no job security, they were not bona fide partners. Therefore Ernst & Young was obligated not to discriminate against them because of their age, sex, race, religion, national origin, or handicap.

In the instant appeal, the defendant has implied that the trial court erroneously applied the "economic realities" test adopted by this circuit in *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir.) *cert. denied,* 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992), in arriving at its decision because *Lilley* was overruled or at least called into question by the Supreme Court's decision in *Nationwide Mutual Ins. Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), which mandated "a common-law test for determining who qualifies as an 'employee' under ERISA," and applied agency law principles, *id.* at 323, 112 S.Ct. at 1348. In its opinion, the trial court expressed some doubt about the continuing vitality of *Lilley* after *Darden.* It is against this backdrop that the court examines the ultimate decision of the trial court.

Initially, it is noted that *Lilley,* like *Darden,* defines the underlying common denominator of the employer/employee rubric as the employer's ability to control job performance and employment opportunities of the aggrieved individual as the most important of many elements to be evaluated in resolving the issue after assessing and weighing all of the incidents of the relationship with no one factor being decisive, as directed in *NLRB v. United Ins. Co. of America,* 390 U.S. 254, 258, 88 S.Ct. 988, 990, 19 L.Ed.2d 1083 (1968). *See also Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961); *NLRB v. Hearst,* 322 U.S. 111, 128–29, 64 S.Ct. 851, 859–60, 88 L.Ed. 1170 (1944).

A panel of this circuit recently concluded that *Lilley's* economic realities test juxtaposed with *Darden's* common-law agency test disclosed no material difference. In *Eyerman v. Mary Kay Cosmetics, Inc.,* 967 F.2d 213 (6th Cir.1992), the court summarized the controlling law in *Darden, Lilley,* and their progenitors by observing:

In *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983), we .... decided that independent contractors would be covered by Title VII if, under an "economic realities" test, they are susceptible to the types of discrimination Title VII meant to prohibit. Although we did not explain in *Armbruster* what sorts of economic realities would tip the scales toward coverage, other circuits using similar tests have held that the *employer's ability to control the job performance and employment opportunities of the plaintiff is the most important factor.* See, e.g., *Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1160–61 (5th Cir.1986) (affirming dismissal against independent contractor truck driver); *Doe v. St. Joseph's Hosp.,* 788 F.2d 411, 425 (7th Cir.1986) (reversing dismissal against independent contractor physician denied staff privileges at hospital).

*Id.* at 218–19 (emphasis added).

The *Eyerman* panel of this court essentially concluded that no substantive conflict between the "economic realities test" as applied in *Lilley, see* 958 F.2d at 750 (leaving the determination of employment status to "case-by-case resolution based on the totality of the circumstances"), and *Darden's* mandate, *see* 503 U.S. at 323, 112 S.Ct. at 1348 ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control

the manner and means by which the product is accomplished.") (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989)). *See Eyerman,* 967 F.2d at 219 n. 5.

■ Applying the *Darden* analysis of the master/servant relationship to the instant case, as particularized by the traditional common-law agency doctrine, this appellate consideration reviews numerous factors impacting the employment relationship to be judged in arriving at a decision with no one decisive factor. Among the elements to be debated in determining the independent contractor/employee question are: the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation. *Darden,* 503 U.S. at 323–24, 112 S.Ct. at 1348–49.

Applying an analog of the Supreme Court's pronouncements in *Darden* to the record in this case, as suggested by Ernst & Young, it is apparent that Simpson does not qualify as a partner for purposes of the ADEA, ERISA, and Ohio Rev.Code § 4101.17, under either the traditional principles of the common-law agency doctrine or the "economic realities" test.

■ Although the conventional agency test is directed to the independent contractor/employee issue, neither this circuit nor the Supreme Court have, to date, considered the partner versus employee question. In approaching the subject, it is significant to observe that bona fide independent contractors and partners are employers, not employees;

and as employers, neither come within the entitlement protection or coverage of either the ADEA or ERISA.

The circuits that have already judged the partner/employee dichotomy have done so by "leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances," *Lilley,* 958 F.2d at 750; *see Darden,* 503 U.S. at 323–24, 112 S.Ct. at 1348–49, against the backdrop of the Uniform Partnership Act ("UPA"), that has been adopted by most states, including New York, which provides the applicable law to the agreements here under review. *See generally* N.Y. Partnership Law § 1 *et seq.* (McKinney 1988).

In *Wheeler v. Hurdman,* 825 F.2d 257 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987), the Tenth Circuit analyzed the "total bundle of partnership characteristics" to distinguish partners from employees. *Id.* at 276. In *Fountain v. Metcalf, Zima & Co.,* 925 F.2d 1398 (11th Cir.1991), the Eleventh Circuit similarly stated:

> [W]e look to the particular circumstances of the case at hand and, in so doing, we focus not on any label, but on the actual role played by the claimant in the operations of the involved entity and the extent to which that role dealt with traditional concepts of management, control and ownership.

*Id.* at 1400–01 (citation omitted).

■ This court, in addressing the distinction between partners and employees, an issue of first impression within this circuit, evaluates the undisputed facts [1] of the instant case against the common-law principles as codified in the UPA, including, but not limited to: the right and duty to participate in management; the right and duty to act as an agent of other partners; exposure to liability; [2] the fiduciary relationship among part-

---

1. In the absence of a conflict of material fact (as stipulated by the parties), which would be resolved by a jury, it is appropriate for the court to resolve the partner/employee relationship *de novo. Cf. Lochman v. Charlevoix,* 94 F.3d 248, 253 (6th Cir.1996).

2. Although the U.S. and Partnership Agreements provide that Simpson was jointly and individually liable for the losses of Ernst & Young, under the facts and circumstances of the instant case, where he had no authority to control the risks undertaken by his "partners," no right to examine the firm's books, and no ability to exercise other ownership attributes, it is questionable if

ners; use of the term "co-owners" to indicate each partner's "power of ultimate control;" participation in profits and losses; investment in the firm; partial ownership of firm assets; voting rights; the aggrieved individual's ability to control and operate the business; the extent to which the aggrieved individual's compensation was calculated as a percentage of the firm's profits; the extent of that individual's employment security; and other similar indicia of ownership. *See Fountain*, 925 F.2d at 1400–01; *Wheeler*, 825 F.2d at 276; *Caruso v. Peat, Marwick, Mitchell & Co.*, 664 F.Supp. 144 (S.D.N.Y. 1987).[3]

Within the embrace of the foregoing criteria, this court concludes that the plaintiff does not qualify as a partner for purposes of the ADEA, ERISA, or Ohio Rev.Code § 4101.17 (Anderson 1989). Accordingly, for the reasons stated herein the decision of the trial court to recognize Simpson as an employee in contradistinction to a partner is AFFIRMED.

■■■ To support a prima facie case of an ADEA violation, Simpson was required to prove he "lost out *because of his age.*" *O'Connor v. Consolidated Coin Caterers*, —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996); *see Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1329 (6th Cir. 1994). Without repeating many of the facts already related herein and more comprehensively discussed by the trial court in arriving at its disposition, this court notes that (1) the new firm's unfunded retirement obligation projected to exceed $290 million, (2) the convoluted Partnership and U.S. Agreements which were calculated to create only an illusion that the firm's personnel were partners, and (3) the arrogant and arbitrary treatment accorded Simpson and those similarly situated reflect a design by that the promoters of the merger and, subsequently, the Management Committee to deny Simpson and those

similarly situated with him from bona fide partners status.

The jury, after considering the evidence in its entirety, and after assigning greater credibility to the plaintiff's found that the promoters of the Ernst & Young merger had wilfully devised a management structure that was, from its very inception, designed to preclude Simpson and his similarly situated associates from any bona fide ownership interest, fiduciary position, management control, voting rights and privileges, share in the profits, and meaningful vote in firm decisions, including decisions involving job security. Moreover, by threatening vigorous enforcement of a "noncompete clause" against Simpson to embrace "all clients or potential clients" of Ernst & Young, which had become one of the world's largest professional service firms, defendant effectively foreclosed Simpson from pursuing his profession as a CPA for two years.

From the evidence developed during the course of the trial, which was common to both the ADEA and ERISA claims, a jury could reasonably conclude that age had been a "determining factor" in Simpson's discharge and his termination was wilful, which findings justifiably anchored the jury's award for past earnings, past benefits, future earnings, and future benefits. Accordingly, this court concludes that the jury's verdict was supported by sufficient evidence, was not clearly erroneous, and is AFFIRMED.

■■■ A decision to submit the issue of front pay to the jury is committed to the sound discretion of the trial court and is reviewed on appeal for abuse of discretion. *Schwartz v. Gregori*, 45 F.3d 1017, 1023 (6th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995); *Shore v. Federal Express Corp.*, 42 F.3d 373, 377–78 (6th Cir. 1994); *Roush v. KFC National Management Co.*, 10 F.3d 392, 398–99 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).

his liability could have been enforced, especially in light of the lack of consideration for his commitment.

**3.** Ernst & Young, in support of its position that Simpson was a partner, cites to *Hyland v. New Haven Radiology Associates*, 794 F.2d 793 (2d

Cir.1986); *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir.1984); *Burke v. Friedman*, 556 F.2d 867 (7th Cir.1977). None of these cases question the plaintiff's ownership participation in the employing entity.

In reviewing the amount of front pay awarded by a jury, the evidence is construed in favor of the prevailing party. In the instant case, plaintiff presented a well-documented economic analysis reflecting the present value of his future damages. Ernst & Young presented no adequate credible explanation to contradict plaintiff's calculations. *See Shore v. Federal Express Corp.*, 777 F.2d 1155, 1159–60 (6th Cir.1985). The calculations were supplemented by evidence that disclosed the underlying hostility that existed between defendant and Simpson, making reinstatement highly impractical and improbable. This is reflected, for example, by (1) his discharge without notice and without the opportunity of a performance review, (2) the curt, non-informative and arbitrary written responses to his retirement inquiries, (3) the divestiture of the units that he owned in Arthur Young's UBT receivables (unbilled time), and (4) the threat of strict enforcement of the non-compete conditions. In light of the foregoing, the trial court's decision to submit the award of front pay to the jury was not an abuse of discretion and the amount of the jury's award is supported by sufficient evidence, not clearly erroneous, and is AFFIRMED.

Having observed that the trial court's factual findings inherent to plaintiff's ERISA claims are, on appeal, reviewed for clear error and its legal conclusions are judged de novo to determine if the district court abused its discretion in applying the law to the facts as already discussed herein, this court considers the plaintiff's ERISA claims within the dictates of *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir.), *cert. denied*, 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992). It concludes that the trial court did not abuse its discretion in applying the law to its findings of fact, which survived the clearly erroneous standard of appellate inquiry. The trial court's award of ERISA damages is AFFIRMED.

In Ohio, an award of prejudgment interest is appropriate under circumstances where a party fails to negotiate a good faith settlement. Ohio Rev.Code § 1343.03(C); *Kalain v. Smith*, 25 Ohio St.3d 157, 495 N.E.2d 572 (1986).

The trial court invoked Ohio Rev.Code § 1343.03(C) upon a record that disclosed a total disinterest on behalf of Ernst & Young to discuss settlement even after the district court dismissed its initial motion for summary judgment seeking a declaration that Simpson was a partner and not an employee. Defendant remained averse to settlement discussion after it became apparent that legal precedent existed supporting plaintiff's position that he was an employee, after a jury mistrial reflected that Simpson's claim had merit, after the court granted plaintiff's motion for summary judgment declaring him to be an "employee" as distinguished from a "partner" in the Ernst & Young firm, and during all phases of the proceedings. Defendant virtually slammed the door of negotiation on innumerable plaintiff overtures to settle the controversy in lieu of continuing protracted, costly legal proceedings.

Upon the record, this court concludes that the trial court did not abuse its discretion in awarding prejudgment interest.

Accordingly, the judgment of the district court is AFFIRMED in its entirety.

DAUGHTREY, Circuit Judge, concurring.

I concur in the results reached by my colleagues in this matter. I write separately, however, to encourage the legislative branch of our federal government to recognize as well that the realities of today's global marketplace no longer justify distinguishing between "employees" and "partners" in all instances.

In an era of small, closely-operated partnerships, it may have been logical to conclude that an employer/partner could not and would not discriminate in employment decisions against himself or herself or against a close friend and business associate. In a world-wide organization like Ernst & Young that employs almost 2200 "partners," however, the nominal co-owners of the company are, by necessity, so far removed from the seat of actual power as to be subject to the reach of the invidious acts that employment discrimination statutes seek to remedy. Only by statutory modifications redefining the class of individuals to be protected from

such mistreatment can we ensure that hiring, promotion, and firing decisions are undertaken with proper regard for the law of the land.