957 F.Supp. 1102 (1997)
Patricia M. RHOADS, Plaintiff,
v.
The JONES FINANCIAL COMPANIES, et al., Defendants.
No. 4:95CV836 FRB.
United States District Court, E.D. Missouri, Eastern Division.
February 11, 1997.
*1103 Mary Anne O. Sedey, President, William E. Moench, Associate, Jon A. Ray, Sedey and Moench, St. Louis, MO, for Patricia M. Rhoads.
Fred A. Ricks, Jr., Associate, McMahon and Berger, St. Louis, MO, John F. Kuenstler, Franczek and Sullivan, Chicago, IL, for Jones Financial Companies and Edward D. Jones & Co., L.P.

MEMORANDUM AND ORDER
BUCKLES, United States Magistrate Judge.
Presently pending before the Court is defendants The Jones Financial Companies and Edward D. Jones & Co., L.P.'s Motion to Dismiss or for Summary Judgment with Respect to Plaintiff's Complaint (filed August 7, 1995/Docket No. 7). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).
In this action, plaintiff claims that her employers, The Jones Financial Companies and Edward D. Jones & Co., L.P., unlawfully discriminated against plaintiff on account of her age and gender. In Count I of her Complaint, plaintiff claims that her employment was terminated by defendants on account of her gender, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, et seq. In Count II, plaintiff claims that her termination was also on account of her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, et seq. In Count III, plaintiff claims that throughout her employment with defendants, she received wages lower than those paid to comparable male employees for equal work, in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, et seq., as amended by the Equal Pay Act, 29 U.S.C. § 206(d). Finally, in Count IV, plaintiff claims that defendants' actions as alleged in Counts I and II of the Complaint violated the Missouri Human Rights Act (MHRA), Mo.Rev.Stat. §§ 213.010, et seq.
Defendants now move to dismiss plaintiff's Complaint or, in the alternative, move for summary judgment claiming that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Specifically, defendants argue that plaintiff lacks standing to invoke the protections of Title VII, the ADEA, FLSA, or MHRA for the reason that plaintiff was at all relevant times a general partner of the corporation and not an employee. In response, plaintiff claims that although she was labelled a "general partner," the circumstances of her employment show her to have been an employee rather than an actual general partner. Because matters outside the pleadings will be considered in determining the instant motion, the undersigned will proceed with defendants' motion as one for summary judgment. See Rule 12(b), Federal Rules of Civil Procedure.
Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden of proof is on the moving party to set forth the basis of its motion, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. The *1104 non-moving party may not rest upon its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.
Summary judgment is a harsh remedy and should not be granted unless the movant "has established his right to judgment with such clarity as to leave no room for controversy." New England Mutual Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). The Eighth Circuit has noted, however, that "summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir.1988).

I. Statement of Undisputed Facts

A. Plaintiff's Employment History

In March 1977, plaintiff began working for Edward D. Jones & Co. (EDJ) as a management trainee in securities processing operations. In January 1978, plaintiff became a supervisor of legal securities transfers. In July 1980, plaintiff became a manager of money market fund operations. (Rhoads Affid. at 1; Pope Affid. at 1.) Plaintiff received W-2 Wage and Tax Statements from EDJ for the years 1977 through 1983. (Defts.' Exh. B.) In 1981, plaintiff became a limited partner in EDJ, and EDJ began reporting plaintiff's share of income, credits, contributions, and deductions on IRS Schedule K-1 forms. (Pope Affid. at 1-2; Defts.' Exh. C.) Schedule K-1 forms for the years 1981 through 1984 show plaintiff not to be a general partner in EDJ. (Defts.' Exh. C.)
Effective January 1, 1984, plaintiff became a "general partner" in EDJ.[1] (Rhoads Affid. at 1; Pope Affid. at 1.) At that time, plaintiff became responsible for all internal processes and procedures, including accounting, mutual funds and money market accounts. (Pope Affid. at 1.) Schedule K-1 forms for the years 1984 through 1986 denote plaintiff as a general partner in EDJ. (Defts.' Exh. D.)
On July 15, 1987, a Reorganization Agreement was created by which The Jones Financial Companies, L.P. (JFC) was formed to become a limited partner in EDJ. (Pope Affid. at 1; Pltf.'s Response, Reorganization Agreement.) Under the Reorganization Agreement, the general partners in EDJ were to become general partners in JFC. (Reorganization Agreement at 4.) All general partners in EDJ who agreed to such reorganization were to sign the agreement. (Reorganization Agreement at 1.) Plaintiff signed the agreement as a general partner in EDJ. (Reorganization Agreement at 11, 13.) On July 17, 1987, plaintiff accepted an Exchange Offer made to limited and subordinated limited partners of EDJ whereby plaintiff's interest in EDJ was exchanged for an equal interest in JFC. On that same date, plaintiff executed a Power of Attorney naming the managing partner of the firm as attorney-in-fact on behalf of plaintiff's limited and subordinated limited partnership interest in JFC. (Pltf.'s Response, Letter of Acceptance and Assignment, and Power of Attorney.) On August 17, 1987, plaintiff assigned her general partnership interest in EDJ to JFC in exchange for general partners capital in JFC. (Pltf.'s Response, Assignment.) Thereafter, Schedule K-1 forms were issued for plaintiff by JFC and showed plaintiff's status and income as a general partner, limited partner and subordinated limited partner in JFC. (Defts.' Exh. E.)
In January 1989, plaintiff became responsible for customer billing, new accounts and listed executions. (Pope Affid. at 2.) In September 1993, plaintiff was informed that effective December 31, 1993, her status as general partner would be terminated. (Rhoads Affid. at 3; Pope Affid. at 2.)

B. The Partnership Agreement

Under the Partnership Agreement,[2] the general partners have exclusive right to manage *1105 the business of the partnership and are authorized to, inter alia, execute any instruments on behalf of the partnership, acquire or sell assets of the partnership, and enter into loans or guarantees in connection with the business of the partnership. (Agreement, art. IV § 4.1(C).)
Under the Partnership Agreement, a managing partner is designated by the general partners. (Agreement, art. IV § 4.1(B).) The managing partner possesses the absolute right to manage the business of the partnership or behalf of the general partners and controls the management and conduct of all of the business transacted by the partnership. (Agreement, art. IV § 4.1(B).) In addition, the managing partner is authorized to, inter alia, admit new general partners to the partnership, dismiss any general partner from the partnership, determine each general partner's adjusted capital contribution and related general partner percentage, determine the guaranteed draw to be paid to each general partner, and execute all documents on behalf of the partnership. (Agreement, art. IV § 4.1(B).) Consent of the general partners is not required for the managing partner to admit additional general partners to the partnership. (Agreement, art. III § 3.2(A).) The authority of the general partners to act as agents of the partnership and to execute instruments in the partnership's name is not restricted by the authority granted to the managing partner. (Agreement, art. IV § 4.1(D).)
The Partnership Agreement also provides for an executive committee of the partnership. The executive committee consists of the managing partner and nine additional general partners. (Agreement, art. IV § 4.4(A).) The general partners may vote to remove any member of the executive committee and elect a new member in his/her place. (Agreement, art. IV § 4.4(G).) The executive committee may vote to remove the managing partner and may vote to elect the managing partner when the office is vacant. (Agreement, art. IV § 4.4(D).) The managing partner may appoint and dismiss any member of the executive committee except those members elected by the general partners. (Agreement, art. IV § 4.4(F), (H).) The executive committee meets weekly to discuss the management of the firm. (Rhoads Affid. at 5.)
Under the Partnership Agreement, the general partners may vote to remove the managing partner or to dismiss any general partner. (Agreement, art. IV § 4.3.) The general partners may vote to remove any member of the executive committee and elect a new member in his/her place. (Agreement, art. IV § 4.4(G).) Each general partner has voting power equal to his/her general partnership percentage in the partnership. (Agreement, art. V § 5.1(B).) General partners may vote in person at a meeting of the general partners or, if not present in person, by proxy given to another general partner. (Agreement, art. V § 5.1(B).) Action required to be taken at a meeting of the general partners may be taken without a meeting if general partners, whose aggregate partnership percentage is more than fifty percent, consent in writing to such action. (Agreement, art. V §§ 5.2, 5.4(A).) General partners located in St. Louis attend monthly meetings at which the executive committee reports on the status of the partnership and any action taken in relation to the partnership. (Rhoads Affid. at 5-6.) A meeting of all general partners is held annually. (Rhoads Affid. at 6.)
Under the Partnership Agreement, the general partners are to receive a guaranteed draw, treated as a guaranteed payment, as determined by the managing partner in his sole discretion. (Agreement, art. IV § 4.5(A).) In addition to this draw, the general partners share profits and losses of the partnership according to their partnership percentage in the partnership. (Agreement, art. VIII § 8.6(A).) The managing partner is authorized to allocate profits and losses in accordance with provisions of the Internal Revenue Code. (Agreement, art. VIII § 8.6(B).) General partners are not entitled to reimbursement for personal expenses incurred *1106 in generating sales of securities to the public, but such expenses can be deducted from the general partners' personal income tax returns. (Agreement, art. IV § 4.5(A).)
Under the Partnership Agreement, all records and books of the partnership are open for examination and inspection by the general partners during reasonable business hours. (Agreement, art. IX § 9.1(A).)
Under the Partnership Agreement, amendments may be made to the Partnership Agreement by the managing partner or by a vote of general partners who hold in the aggregate a majority of the total general partnership percentages. (Agreement, art. X § 10.13.)
Under the Partnership Agreement, a general partner may be requested to withdraw from the partnership by the managing partner or any number of general partners who hold in the aggregate a majority of the general partnership percentages. (Agreement, art. VI § 6.2.) Upon withdrawal from the partnership, a general partner remains liable for obligations of the partnership incurred prior to the general partner's withdrawal but not for obligations incurred thereafter. (Agreement, art. VI § 6.8.)

C. Plaintiff's Conduct Under the Agreement

From 1984 through 1993, plaintiff received a distribution of profits based on her general partnership percentage in the partnership. (Rhoads Affid. at 5; Defts.' Exh. F.) Plaintiff made capital contributions to the firm, and JFC maintained a capital account for each general partner in the firm. (Rhoads Affid. at 3; Agreement at art. I, art. III § 3.5; Defts.' Exh. F.) Plaintiff was able to make her initial capital contribution through a bank loan arranged by EDJ. (Rhoads Affid. at 3.) Subsequent capital contributions were made by the firm's retention of a portion of plaintiff's profits distribution. The retained profits were reinvested in the firm. (Rhoads Affid. at 5; Agreement, art. VIII § 8.1(A)(iv); Defts.' Exh. F.) Plaintiff repaid the bank loan through deductions from her monthly pay. (Rhoads Affid. at 3.)

II. Discussion
Plaintiff may recover on her claims only if she was an employee of defendants at the time of the alleged discriminatory conduct. See Hyland v. New Haven Radiology Assocs., P.C., 794 F.2d 793, 796 (2d Cir.1986) (ADEA); Garrett v. Phillips Mills, Inc., 721 F.2d 979, 980-81 (4th Cir.1983) (ADEA); Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir.) (Title VII), cert. denied, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982); Mednick v. Albert Enterprises, Inc., 508 F.2d 297 (Cir.5th 1975). Partners in a partnership are not employees and thus cannot avail themselves of the benefits of the antidiscrimination statutes. Hyland, 794 F.2d at 797 (citing Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Burke v. Friedman, 556 F.2d 867 (7th Cir. 1977)). However, because the employment relationship turns on the substance of the relationship rather than the label affixed thereto, the Court must look to the actual duties and role of the individual to determine whether the individual was an "employee" or a "partner" with the company. Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81 (8th Cir.1996).
Plaintiff argues that the attributes of her relationship with defendants are those of an employee rather than a partner. Plaintiff relies on Simpson v. Ernst & Young, 850 F.Supp. 648 (S.D.Ohio 1994), aff'd, 100 F.3d 436 (6th Cir.1996), to support her argument. In Simpson, plaintiff was a certified public accountant and a partner with the accounting firm of Arthur Young. Simpson, 850 F.Supp. at 650. Arthur Young and Ernst & Whinney merged and became Ernst & Young, and Simpson remained a partner in the merged firm. The merged firm consisted of two entities: Ernst & Young, and Ernst & Young U.S. The Ernst & Young partners, including Simpson, were required to sign a partnership agreement with Ernst & Young U.S. The signatories to this agreement were termed "parties" rather than "partners." Id. Capital contributions to Ernst & Young U.S. were not made out-of-pocket, but rather consisted of bank loans upon which the firm paid interest. In addition, Ernst & Young U.S. paid interest to its *1107 parties on their "capital contributions" rather than a pro rata share of the profits. Id. at 651, 659. Ernst & Young U.S. paid Simpson an annual salary which was denoted as such for purposes of reporting state taxes. The salary was denoted as partnership earnings for federal tax reporting purposes. The partnership agreement referred to an allocation of Ernst & Young's profits and losses, but Simpson received no compensation from the Ernst & Young entity. Id. at 651. Although Simpson had voting rights under the agreement, an advisory council, of the firm could approve or disapprove of any party-vote. Id. at 652. Simpson could examine the books and records of the firm only to the extent permitted by the chairman or management committee. He was required to maintain a will which provided that his heirs and representatives would accept as correct the firm's books and records without examination. Id. Simpson was subject to performance reviews and Simpson's allocation under the agreement was based on his performance, level of responsibility and years of service, among other factors. Id. at 651-52. Based on these facts, the district court found that Simpson possessed few attributes of partner status and determined that Simpson was not a bona fide partner but rather was an employee of Ernst & Young. Id. at 659-65.
Unlike the employee in Simpson, the plaintiff here possessed numerous indicia of partner status in the partnership. First, plaintiff had a bona fide ownership interest in the partnership in that she made periodic capital contributions to the partnership. Although plaintiff argues that her initial contribution was made through a firm-arranged loan like that in Simpson, the evidence before the Court shows that plaintiff nevertheless was liable for the loan and was required to meet the obligations of the loan. Unlike the plaintiff in Simpson, the plaintiff here shared in the profits of the partnership rather than merely collected interest on capital "loaned" to the company. Plaintiff here also shared in the losses of the partnership. In addition, plaintiff possessed meaningful voting rights as a general partner, and the votes of the general partners were not subject to approval or any other type of review by the managing partner or executive committee. Further, plaintiff possessed a virtually unlimited[3] right to examine the books and records of the partnership. All of these attributes are indicia of partner status rather than that of an employee. See Simpson v. Ernst & Young, 100 F.3d 436, 443-44 (6th Cir.1996); Fountain v. Metcalf, Zima & Co., P.A., 925 F.2d 1398, 1401 (11th Cir.1991); Burke v. Friedman, 556 F.2d 867, 869 (7th Cir.1977).
Unlike the voting "rights" in Simpson where the advisory council had veto power over votes put to the partners, 850 F.Supp. at 661, the voting rights involved here were not illusory inasmuch as the general partners had ultimate control over the managing partner and the executive committee by virtue of the right to vote them out of office. Indeed, the evidence shows that the voting rights enjoyed by the plaintiff here included the right to vote her ownership interest on matters concerning retention of the managing partner, members of the executive committee and other general partners, as well as voting on amendments to the Partnership Agreement. Such voting rights are indicia of partner status. Simpson, 100 F.3d at 444; Fountain, 925 F.2d at 1401. Although plaintiff avers that she was never "given the opportunity" to vote on these matters (Rhoads Affid. at 4, 5), plaintiff has come forward with no evidence to show that she did not, in fact, possess these voting rights or was denied the opportunity to exercise her right to vote her ownership interest on these matters.
Further, unlike the employee in Simpson, the plaintiff here was referred to as a general partner in all partnership documents and indeed signed documents in her capacity as a general partner. In Simpson, the employee was referred to as a "party" rather than as a "partner."[4]Simpson, 850 *1108 F.Supp. at 663. In addition, the plaintiff in Simpson was required to sign the partnership agreement in the firm, whereas the plaintiff in the instant cause acknowledges that she was "offered the opportunity" to become a general partner. (Rhoads Affid. at 1.) In addition, the evidence shows that the plaintiff here was liable for certain debts, obligations and liabilities, and that such liability did not extinguish upon plaintiff's termination as a general partner. Such liability on behalf of the partnership is indicia of partner status. Simpson, 100 F.3d at 443; Fountain, 925 F.2d at 1401. Finally, defendants' cessation of withholding taxes for plaintiff subsequent to plaintiff becoming a "general partner" is further indicia of partner status. Fountain, 925 F.2d at 1401.
Although plaintiff complains that all management decisions were made by the managing partner and executive committee, the Partnership Agreement expressly grants such management authority to the managing partner.[5] Regardless of this authority possessed by the managing partner and the executive committee, the general partners nevertheless retained the exclusive right to manage the firm  including the right to execute any instruments on behalf of the firm, acquire or sell assets of the firm, and enter into loans or guarantees in connection with the business of the firm  and any authority possessed by the managing partner did not diminish this right. Although plaintiff claims that she did not exercise these rights, plaintiff has presented no evidence to rebut defendants' showing that she possessed these management rights or to show that she was prevented from exercising them. The right and duty to participate in the management of a partnership is indicia of partner status. Simpson, 100 F.3d at 443. In addition, the evidence shows that the managing partner and executive committee could not engage in management with unbridled power, as plaintiff infers, inasmuch as the general partners had the right to dismiss the managing partner and/or members of the executive committee upon a vote of the majority of the ownership interests, and to name a new managing partner or new members in their stead.
Plaintiff does not contest that she made capital contributions to the partnership and was distributed profits according to her ownership interest in the firm. Such investment in the partnership and correlating compensation are indicia of partner status. See Simpson, 100 F.3d at 444; Fountain, 925 F.2d at 1401. Although plaintiff claims that she had no input as to the amount of her ownership percentage in the partnership (Rhoads Affid. at 4-5), the Partnership Agreement expressly provides that percentage of ownership may change with the admission and dismissal of other general partners as well as with adjustments to partners' capital contributions. Indeed, it is reasonable to infer that a change in membership of the general partners or of their contributions would likely result in a change in the remaining general partners' individual percentages of ownership interest in the partnership. Plaintiff also claims, however, that she had no input into the amount of profit distribution. As discussed above, the amount of profits distributed to the general partners was determined by the percentage of ownership interest possessed by each partner and not by any determination made by the general partners or anyone else. Profit allocation was made in compliance with the provisions of the Internal Revenue Code. As to the aggregate amount of profits to be distributed, the undersigned notes that the Partnership Agreement sets out a precise formula for determining the amount of profits to be distributed to the general partners. (Agreement, art. VIII § 8.6.)
Plaintiff complains that her employee status is evident by the manner in which her general partner status was terminated, that is, that the general partners were not "asked" to vote on the termination of plaintiff's partnership status. (Rhoads Affid. at 3.) However, the evidence before the Court shows that general partners need not be *1109 "asked" to vote relating to the status of another general partner. Under the Partnership Agreement, a general partner may be requested to withdraw from the partnership by the managing partner or any number of general partners who hold in the aggregate a majority of the general partnership percentages.[6]
Finally, plaintiff attests that she possessed the attributes of an employee inasmuch as she was subject to a written job description which set out her duties and responsibilities; that she could not hire or discharge subordinates without approval by the managing partner or other general partners; that she could not determine wage increases or bonuses for her subordinates without approval by the managing partner or other general partners; that she was required to provide monthly status reports relating to the performance of her department; and that her subordinates were required to provide regular reports as well. (Rhoads Affid. at 2.) Contrary to plaintiff's argument, such indicia of employee status does not destroy plaintiff's status as a partner. See Wheeler v. Hurdman, 825 F.2d 257, 261 (10th Cir.) (individual determined to be bona fide partner even though nature of work remained unchanged after becoming partner, she was supervised in her work and work assignments, and personnel file maintained), cert. denied, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). This is especially so in circumstances, such as here, where the individual shares in the profits and losses of the partnership, is exposed to liability of the partnership, invests in the partnership, partially owns the partnership's assets, and possesses voting rights in the partnership. Id. at 274-76.
The sum of plaintiff's argument is that she cannot be considered a general partner inasmuch as she was not personally involved in business decisions of the partnership and was controlled in her work by other general partners. This argument was raised and rejected in Wheeler:
The heart of the standard proposed to us is a theory that any individual who is organizationally or economically dominated is an employee. In applying the domination theory to partnerships, there is an underlying assumption by its proponents that a "true" general partnership operates like a New England town meeting; that "true" general partners are not employees because they personally control management of the business and their own affairs within the business; that "true" general partners are not "dominated;" they are not controlled; they enjoy equality of bargaining power. Presumably, a "true" partner is not only heard at partnership meetings but actually controls the result as it affects that partner.
With due respect, those arguments and assumptions are not likely to translate to the real world with any discernable limits. ... [D]e facto "domination" or "control" of work, clients, billings, and compensation by key partners may be more common than not[.] ... "Domination" of a partner in assignment and supervision of work, billing, share of profits, and other matters can result from a myriad of wholly practical reasons existing from time to time in any partnership. Furthermore, a certain amount of "domination" may flow from the necessity of an organizational structure even in the smallest partnership. ... [W]e must wonder just how many partners ... in the real world ["actually [] control factors such as the management of the firm and critical elements of his or her work"], and if any partnership of any duration would not have employee partners. What the [plaintiffs] are describing as true partners are sole proprietors and a limited number of dominant partners nationwide.
Wheeler, 825 F.2d at 273 (emphasis in the original)
The court's observations in Wheeler are equally applicable here. Although plaintiff did not participate in the micro-management of the partnership and was not involved in most of the day-to-day affairs of the partnership's business, plaintiff nevertheless enjoyed the benefits of numerous and significant attributes *1110 of partner status. Possessing a few indicia of employee status did not destroy plaintiff's status as a partner.

III. Conclusion
The evidence before the Court shows that at the time of plaintiff's alleged discriminatory discharge, plaintiff was a bona fide partner and not an employee of the partnership. As such, plaintiff cannot invoke the protection of the federal antidiscriminatory statutes to support her claims of discriminatory discharge as alleged in Counts I and II of her Complaint. Therefore, defendants should be granted judgment as a matter of law as to these claims. Plaintiff's MHRA claim raised in Count IV of her Complaint relates only to the circumstances of plaintiff's discharge. Inasmuch as "federal employment discrimination decisions [are] applicable and authoritative under the MHRA,'" Tart v. Hill Behan Lumber Co., 31 F.3d 668, 671 (8th Cir.1994) (quoting Lane v. Ground Round, Inc., 775 F.Supp. 1219, 1223 (E.D.Mo.1991) (citing Midstate Oil v. Missouri Comm'n on Human Rights, 679 S.W.2d 842, 846 (Mo.1984) (en banc))), defendants should be granted judgment as a matter of law as to Count IV of plaintiff's Complaint as well.
As to Count III of plaintiff's Complaint, plaintiff alleges that throughout her employment with defendants, she received wages lower than those paid to comparable male employees for equal work, in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, et seq., as amended by the Equal Pay Act, 29 U.S.C. § 206(d). It is undisputed that plaintiff was an employee with the defendants before attaining partner status on January 1, 1984. Because plaintiff alleges that the discriminatory conduct occurred "throughout her employment" (Complaint at 6), the evidence now before the Court demonstrates that plaintiff's claim as alleged in Count III is sufficient to bring defendants' alleged conduct occurring on or before December 31, 1983, within the proscriptions of the FLSA. However, an aggrieved party must bring a claim under the FLSA not later than two years after the alleged discriminatory conduct, or three years after the alleged conduct if the conduct is wilful. 29 U.S.C. § 255(a). See Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164 (8th Cir.1995) (statute of limitations set out in § 255(a) applies to claims under the Equal Pay Act). Inasmuch as the last date upon which plaintiff's FLSA claim could have accrued was December 31, 1983, plaintiff was required to bring her cause of action not later than December 31, 1986. Because this cause of action was not filed until May 10, 1995, it falls outside the proscribed statute of limitations and is "forever barred" from review. 29 U.S.C. § 255(a).
The undersigned notes that defendants have moved to strike portions of the plaintiff's affidavit (filed November 22, 1995/Docket No. 17). For purposes of this Memorandum and Order, the undersigned has considered plaintiff's affidavit in its entirety. Inasmuch as such consideration does not affect the disposition of this cause, defendants' motion should be denied as moot.
Therefore, for all of the foregoing reasons,
IT IS HEREBY ORDERED that defendants The Jones Financial Companies and Edward D. Jones & Co., L.P.'s Motion to Dismiss or for Summary Judgment with Respect to Plaintiff's Complaint (Docket No. 7), considered by the Court as a motion for summary judgment, is granted.
IT IS FURTHER ORDERED that defendants' Motion to Strike Portions of the Plaintiff's Affidavit (Docket No. 17) is denied as moot.
Judgment shall be entered accordingly.
NOTES
[1] In this Statement of Undisputed Facts, the term "general partner" is used only as a label and is not based upon any legal conclusion that plaintiff individually possessed the indicia of being a general partner.
[2] All references to the "Partnership Agreement" are made to JFC's Fifth Amended and Restated Agreement of Limited Partnership, dated May 24, 1993 (Pltf.'s Response, Fifth Amended Agreement). Plaintiff argues that this Partnership Agreement governs the circumstances of plaintiff's dismissal inasmuch as the decision to terminate plaintiff's general partnership status occurred prior to ratification of the Sixth Amended and Restated Agreement, dated October 1, 1993 (Defts.' Exh. A).
[3] Examination of the partnership's books and records is limited only to the extent that such examination is to take place during reasonable business hours. (Agreement, art. IX § 9.1(A).)
[4] The court in Simpson noted that although a mere label placed on an individual is not determinative of that person's position, the label nevertheless was significant. Simpson, 850 F.Supp. at 663.
[5] If the general partners disapproved of the provisions of the Partnership Agreement, they had the right to amend the Partnership Agreement upon a vote.
[6] If the general partners disapproved of the provisions of the Partnership Agreement, they had the right to amend the Partnership Agreement upon a vote.